**CENTER FOR NATIONAL SECURITY
STUDIES, et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT
OF JUSTICE, Defendant.**

No. CIV.A.01–2500(GK).

United States District Court,
District of Columbia.

Aug. 2, 2002.

Arthur Barry Spitzer, Washington, DC, Steven R. Shapiro, Lucas Guttentag, Amer. Civil Liberties Union Foundation, New York City, David Lane Sobel, Washington, DC, Kate Abbott Martin Washington, DC, for plaintiffs.

Lisa Ann Olson, U.S. Dept. of Justice, Washington, DC, for U.S. Dept. of Justice, defendant.

Paul Douglas Kamenar, Washington Legal Foundation, Washington, DC, for Jewish Institute for Nat. Security Affairs, Washington Legal Foundation, amicus.

### MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiffs are the Center for National Security Studies, the American Civil Liberties Union, and twenty-one other public interest organizations committed to civil rights, human rights, and civil liberties issues.[1] Defendant is the Department of Justice ("DOJ").

1. Plaintiffs are the Center for National Security Studies, American Civil Liberties Union, Electronic Privacy Information Center, American–Arab Anti–Discrimination Committee, American Immigration Law Foundation, American Immigration Lawyers Association, Amnesty International USA, Arab–American Institute, Asian–American Legal Defense and Education Fund, Center for Constitutional Rights, Center for Democracy and Technolo-gy, Council on American Islamic Relations, First Amendment Foundation, Human Rights Watch, Multiracial Activist, Nation Magazine, National Association of Criminal Defense Lawyers, National Black Police Association, Inc., Partnership for Civil Justice, Inc., People for the American Way Foundation, Reporters Committee for Freedom of the Press, and the World Organization Against Torture USA.

On September 11, 2001—truly a day of infamy in our national history—this country was attacked by terrorists in New York City and at the Pentagon across the river from Washington, D.C. We will recover from the physical damage inflicted by those attacks. The psychic damage suffered by the body politic of our country may take far longer to heal.

Immediately after the terrible events of September 11, the Government began its massive effort to investigate, identify and apprehend those who were responsible and to protect the American public against further attacks of this nature. As part of that effort the Government arrested and jailed—or in the bloodless language of the law "detained"—well over 1000 people in connection with its investigation. Despite demands from members of Congress, numerous civil liberties and human rights organizations, and the media, the Government refused to make public the number of people arrested, their names, their lawyers, the reasons for their detention, and other information relating to their whereabouts and circumstances.[2]

Secret arrests are "a concept odious to a democratic society," *Morrow v. District of Columbia*, 417 F.2d 728, 741–742 (D.C.Cir. 1969), and profoundly antithetical to the bedrock values that characterize a free and open one such as ours. Plaintiffs in this case seek to vindicate that fundamental principle by relying primarily on the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as well as the First Amendment and common law. The animating principle behind the Freedom of Information Act is safeguarding the American public's right to know what "their Government is up to." *United States v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 773, 109 S.Ct. 1468 (1989)(internal citations omitted). In enacting that statute, Congress recognized that access to government records is critical to earning and keeping citizens' faith in their public institutions and to ensuring that those institutions operate within the bounds of the law.

Difficult times such as these have always tested our fidelity to the core democratic values of openness, government accountability, and the rule of law. The Court fully understands and appreciates that the first priority of the executive branch in a time of crisis is to ensure the physical security of its citizens. By the same token, the first priority of the judicial branch must be to ensure that our Government always operates within the statutory and constitutional constraints which distinguish a democracy from a dictatorship.

With these considerations in mind, the Court now turns to the parties' motions. This matter is before the Court on Defendant's Motion for Summary Judgment ("Def.'s Mot.") and Plaintiffs' Cross-motion for Summary Judgment ("Pls.' Mot."). Upon consideration of the motions, oppositions, replies, the Motions Hearing held in this matter on May 29, 2002, the amicus brief submitted by the Washington Legal Foundation, and the entire record herein, and for the reasons stated below, the Court **grants in part and denies in part** Defendant's Motion for Summary Judg-

---

**2.** Several newspapers wrote editorials urging the Government to release the names of the detainees, as did several ranking members of Congress. *See, e.g., Why Not Disclose?,* Wash. Post, Oct. 31, 2001, at A26 (attached as Ex. 11 to Pls.' Mot.); *Disappearing in America,* N.Y. Times, Nov. 10, 2001, at A22 (attached as Ex. 15 to Pls.' Mot.); *Government Too Secretive About Jailing Immigrants,* Atlanta Journal–Constitution, Nov. 12, 2001, at A11 (attached as Ex. 16 to Pls.' Mot.); *see also* Pls.' Mot., Ex. 17 (October 31, 2001 letter to Attorney General John Ashcroft from Senators Patrick J. Leahy, Russell D. Feingold, Edward M. Kennedy and Representatives John Conyers, Jr. Jerrold Nadler, Sheila Jackson Lee, and Robert C. Scott).

ment and **grants in part and denies in part** Plaintiffs' Cross Motion for Summary Judgment.

## I. BACKGROUND

Following the terrorist attacks of September 11, 2001, the United States government launched a massive investigation into the attacks as well as into "threats, conspiracies, and attempts to perpetrate terrorist acts against [the] United States." Declaration of James S. Reynolds ("Reynolds Decl.") ¶ 2 (Attached as Ex. 1 to Def.'s Mot.).

On October 25, 2001, Attorney General John Ashcroft announced that the "anti-terrorism offensive has arrested or detained nearly 1,000 individuals as part of the September 11 investigation." Amended Compl. ¶ 28; Answer ¶ 28; Reynolds Decl. ¶¶ 3–4.

At the time of that announcement, the Government refused to reveal the names of those who were arrested or detained, as well as the circumstances of their arrest and detention, including dates of arrest or release, locations of arrest and detention, and the nature of the charges filed.[3]

### A. Plaintiffs' FOIA Request

On October 29, 2001, Plaintiffs submitted three letters to DOJ, sending one to the FBI, another to the Office of Information Privacy ("OIP"), and the third to the Immigration and Naturalization Service ("INS"), requesting information about those arrested by the Government in connection with its September 11 investigation. Specifically, they sought disclosure of the following four categories of information:

1. Identities of each [detainee], the circumstances of their detention or arrest, and any charges brought against

them. In particular, (1) their names and citizenship status; (2) the location where each individual was arrested or detained initially and the location where they are currently held; (3) the dates they were detained or arrested, the dates any charges were filed, and the dates they were released, if they have been released; and (4) the nature of any criminal or immigration charges filed against them or other basis for detaining them, including material witness warrants and the disposition of any such charges or warrants.

2. The identities of any lawyers representing any of these individuals, including their names and addresses.

3. The identities of any courts, which have been requested to enter orders sealing any proceeding in connection with any of these individuals, any such orders that have been entered, and the legal authorities that the government has relied upon in seeking any such secrecy orders.

4. All policy directives or guidance issued to officials about making public statements or disclosures about these individuals or about the sealing of judicial or immigration proceedings.

Pls.' Mot., Ex. 10. Plaintiffs also requested expedited processing of their FOIA request.

On November 1, 2001, OIP advised Plaintiffs that their request for expedited processing had been granted on the ground that the request involved a "matter of widespread and exceptional media interest in which there exists possible questions about the government's integrity which affect public confidence." Def.'s Mot., Ex. 4, attachment B (citing 28 C.F.R. § 16.5(d)(1)(iv)(2001)).

---

**3.** Numerous groups, including various Plaintiffs, have voiced fears that the arrests were based on racial, religious, and ethnic profil-

ing. They sought this information in order to determine if these fears were justified.

The INS responded on November 23, 2001, granting expedited treatment of Plaintiffs' FOIA request and requesting that Plaintiffs narrow the scope of their request. *See* Declaration of Raymond Holmes ("Holmes Decl.") ¶ 7, attachment F. (attached as Ex. 3 to Def.'s Mot.).

The FBI responded to Plaintiffs' FOIA request on November 1, 2001, indicating that it had reviewed Plaintiffs' request on an expedited basis and that all "material responsive to [plaintiffs'] request was being withheld pursuant to [Exemption 7(a) ]" of FOIA. *See* Declaration of Scott A. Hodes ("Hodes Decl.") ¶ 4 (attached as Ex. 2 to Def.'s Mot.). Plaintiffs appealed, and on December 10, the FBI affirmed its denial under both Exemptions 7(A) and 7(C), 5 U.S.C. § 552(b)(7)(A),(C). Hodes Dec. ¶ 4

## B. Information Disclosed by DOJ

The Government asserts that those it has arrested and detained fall into one of three categories: (1) persons held on immigration-related charges by INS; (2) persons charged with federal crimes; and (3) persons held on material witness warrants. DOJ has released the following information about each of the three categories of detainees.

4. DOJ acknowledged that "many [of the INS related detainees] have [been] ... cleared of any wrongdoing." Def.'s Mot. at 23. On July 1, 2002, 130 Pakistanis who had been held on visa violations and other charges were deported to Pakistan under an agreement between the U.S. government and the Pakistani Embassy. Of the 131 sent home, 110 were convicted of immigration violations and 22 were convicted of credit card fraud, possession of narcotics, robbery or assault. None was linked to the terrorist attacks on the World Trade Center and the Pentagon. *See* Steve Fainaru, *U.S. Deported 131 Detainees in Secret Airlift; Diplomatic Issues Cited; No Terrorist Ties Found*, Washington Post, July 10, 2002, at A1; *see* Susan Sachs, Traces of Terror: The Detainees; *U.S. Deports Most of Those Arrest-*

## 1. Immigration Detainees

The Government has detained a total of 751 individuals on immigration violations over the course of its investigation. *See* Def.'s Response to the Court's Order of May 31, 2002. As of June 13, 2002, the number of people still being held in INS custody was 74.[4] *Id.*

For 718 of the 751 individuals detained, DOJ has revealed their place of birth and citizenship status, as well as the dates any immigration charges were filed, and the nature of those charges. *See* Def.'s Mot., Ex. 6 ("INS Special Interest List: Joint Terrorism Task Force Working Group"). The Government has withheld the names of those detained, the dates and locations of their arrest and detention, the dates of release for those 677 who were released,[5] and the identities of their lawyers.

## 2. Federally Charged Detainees

A total of 129 people have been detained on federal criminal charges since September 11, 2001. As of June 11, 2002, 73 individuals remained in detention on criminal charges. Def.'s Response to the Court's Order of May 31, 2002 at 2. Only one of these has been charged in connection with the September 11 attacks.[6] *See* Reynolds Decl. ¶ 27.

*ed In Sweeps After 9/11*, N.Y. Times, July 11, 2002, National Desk; *Scores of Pakistanis Are Deported By U.S.*, N.Y. Times, July 10, 2002, at A10.

5. This number is derived from the figures provided in Def.'s Response to the Court's Order of May 31, 2002. Defendant indicated therein that as of June 11, 2002, only 74 of the total 751 detainees were still in custody.

6. This individual is Zaccharias Moussaui, who was apprehended prior to September 11, 2001. No individual arrested after the attacks on September 11, 2001, has been charged in connection with those attacks. *See* Reynolds Decl. ¶ 27.

DOJ has released the names of all individuals federally charged, with the exception of one defendant whose case is sealed by court order. *See* Def.'s Response to this Court's Order of May 31, 2002. Defendant also released the dates charges were filed; the nature of the charges filed; the dates any detainees were released; and their lawyers' identities. The Government continues to withhold information concerning dates or locations of arrest as well as the dates and locations of detention.

### 3. Material Witness Detainees

With respect to those held on material witness warrants, DOJ has withheld all information, including the number of individuals detained on material witness warrants, their names, citizenship status and place of birth, dates and location of their arrest and detention, and their lawyers' identities.

### 4. Policy Directives and Guidance

DOJ has released only two documents in response to Plaintiffs' request for "policy directives or guidance" concerning the detainees. One is a heavily redacted document entitled "draft talking points," which contains guidelines that DOJ personnel must follow when making public statements about the detainees. *See* Declaration of Melanie Ann Pustay ¶ 6 ("Pustay Decl.") (attached as Ex. 8 to Def.'s Reply). The other is a memorandum from the Chief Immigration Judge to all immigration judges and court administrators reminding them that immigration hearings are to be closed to the public. *See* Pls.' Mot., Ex. 57.

### 5. Total Numbers of Detainees

Finally, DOJ has withheld the total number of individuals arrested and detained in connection with its September 11 investigation.[7]

## II. STANDARD OF REVIEW

Summary judgment will be granted when the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

In FOIA cases, the Court may grant summary judgment on the basis of government affidavits or declarations that explain why requested information falls within a claimed exemption, as long as the affidavits or declarations are sufficiently detailed, non-conclusory, and submitted in good faith, and as long as a plaintiff has no significant basis for questioning their reliability. *Goland v. CIA*, 607 F.2d 339, 352 (D.C.Cir.1978); *see also Coastal States Gas Corp. v. United States Dep't of Energy*, 617 F.2d 854, 861 (D.C.Cir.1980). In determining whether the government may properly withhold requested information under any of FOIA's exemptions, the district court conducts a *de novo* review of the government's decision. 5 U.S.C. § 552(a)(4)(B).

## III. ANALYSIS

As of this moment, the public does not know how many persons the Government has arrested and detained as part of its September 11 investigation; nor does it know who most of them are, where they

---

7. On November 5, 2001, DOJ indicated that 1,182 people had been detained. On November 8, 2001, DOJ announced that it would no longer provide a running total of all individuals detained in connection with the investigation, but only of those charged with federal crimes or immigration violations, and that it would only release information on the number of detainees currently in custody, and not the total number detained in the course of the investigation. *See* Pls.' Mot. at 4, Ex. 19.

are, whether they are represented by counsel, and if so, who their counsel are. Plaintiffs rely on FOIA, as well as the First Amendment and common law, to obtain this information.

The fundamental purpose of FOIA is to lift the veil of "secrecy in government." *Reporters Committee*, 489 U.S. at 772–773, 109 S.Ct. 1468 (internal citations omitted). To that end, FOIA is designed to " 'open[ ] up the workings of government to public scrutiny' " through the disclosure of government records. *McGehee v. CIA*, 697 F.2d 1095, 1108 (D.C.Cir.1983)(internal citation omitted). In order to accomplish that goal, the Act mandates "full agency disclosure *unless* information is exempted under clearly delineated statutory language." *Reporters Committee*, 489 U.S. at 773, 109 S.Ct. 1468 (emphasis added). In short, the Government bears the burden of proving why information should not be disclosed to the public.

The Government invokes Exemptions 7A, 7C and 7F of FOIA, which protect from disclosure any records or information "compiled for law enforcement purposes" whenever disclosure:

> (A) could reasonably be expected to interfere with enforcement proceedings,....(C) could reasonably be expected to constitute an unwarranted invasion of personal privacy,...or (F) could reasonably be expected to endanger the life or physical safety of any individual.

5 U.S.C. § 552(b)(7)(A), (C), (F). Defendant also relies on Exemption 3 to withhold the identities of the material witnesses. That exemption permits the Government to withhold information that is protected by federal statute.

Before turning to the merits of these exemptions, the Court observes preliminarily that both parties have argued this case as if it were an "all or nothing" disclosure decision. The Government's main affidavits, for example, treat Plaintiffs' request for the detainees' names, their arrest and detention history, and their lawyers' names, as if it were an undifferentiated body of information. FOIA, however, requires a court to conduct a particularized and focused inquiry for each discrete category of information withheld by the Government. *See generally Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir.1973); *Manna v. United States Dep't of Justice*, 51 F.3d 1158, 1163 (3rd Cir.1995). The Court therefore will examine whether the Government's FOIA rationales support its withholding for each separate category of information in issue.

As explained below, the Court concludes that: (1) the Government must release the identities of all individuals detained during the course of its September 11 investigation. To the extent that the Government contends certain material witness identities are sealed by court order, it must submit such orders for *in camera* inspection or provide supplemental affidavits clarifying the nature of those orders; (2) the Government has properly withheld the dates and locations of arrest, detention and release; (3) the Government must disclose the identities of counsel representing those detained; and (4) the Government has conducted an inadequate search with respect to its policy directives and must conduct an additional search of its records.

## A. The Government Must Disclose the Names of The Detainees.

### 1. The Government Cannot Withhold the Names of the Detainees Under Exemption 7A.[8]

The Government devotes most of its briefing to FOIA Exemption 7A, which

---

8. Before considering whether the subparts of Exemption 7 apply, a court must find that the information at issue was "compiled for law enforcement purposes." There is no question that the Government's affidavits establish that

protects from disclosure any information "compiled for law enforcement purposes" whenever it "could reasonably be expected to interfere with enforcement proceedings..." [9]

The Government affidavits provide three rationales in support of Exemption 7A. First, the detainees may be "knowledgeable witnesses," and disclosure of their names could "deter them from cooperating... once they are released from custody and impair their usefulness to the ongoing investigation." Reynolds Decl. ¶¶ 14–15; *see also* Supp. Reynolds Decl. ¶ 6 In particular, the Government worries that upon learning that their members have been detained, "terrorist organizations... may refuse to deal further with [the detainees]," or may threaten them, thereby "eliminat[ing] valuable sources of information." *Id.*

Second, "releasing the names of the detainees who may be associated with terrorism... would reveal the direction and progress of the investigations by identifying where DOJ is focusing its efforts." Reynolds Decl. ¶ 16. This could "allow terrorist organizations to map the progress of the investigation and thereby develop the means to impede them." Reynolds Decl. ¶ 16; Suppl. Reynolds Decl. ¶ 6; Watson Decl. ¶ 15

Finally, "public release of names...could allow terrorist organizations and others to interfere with the pending proceedings by creating false or misleading evidence." Reynolds Decl. ¶ 17.

#### a. The Government Has Failed to Demonstrate that Disclosure Could Deter Cooperation.

█ The Government's first rationale— that disclosure will deter cooperation because terrorist groups will intimidate or cut off contact with the detainees—is unpersuasive for several reasons.

First, it assumes terrorist groups do not already know that their cell members have been detained. The Government has emphasized that the detainees are entitled to inform whomever they want of their detention. Given this option of "self-disclosure", and given that more than 10 months have passed since September 11, it is implausible that terrorist groups would not have figured out whether their members have been detained. Defendant has offered no reason to believe that terrorist groups would not know of the detentions.

Second, the Government's rationale is contradicted by its own extensive disclosures. The Government has released the names of individuals it has identified as members of al Qaeda or connected to that organization.[10] *See* Pls.'Supplemental

---

the information sought in this case was gathered expressly for the legitimate law enforcement purpose of investigating the September 11, 2001 terrorist attacks. *See* Declaration of Dale L. Watson ("Watson Decl.") ¶¶ 2–7. (attached as Ex. 7 to Def.'s Reply); Reynolds Decl. ¶¶ 2–4.

9. Although typically there must be a pending or a specific "concrete prospective law enforcement proceeding" at issue, *see Carson v. U.S. Dep't of Justice*, 631 F.2d 1008, 1018 (D.C.Cir.1980), Exemption 7A has also been extended to protect information related to ongoing investigations likely to lead to such proceedings, as in this case. *See Bevis v. Dep't of State*, 801 F.2d 1386 (D.C.Cir.1986).

10. It has arrested Issaya Nombo on immigration charges after a letter congratulating him on obtaining his pilot's license was discovered in a cave in Afghanistan. *Id.* It announced that it had captured Jose Padilla and was holding him as a material witness after a lead from Abu Zabaydah; Mr. Padilla was thought to be building a "dirty bomb" in the United States. *Id.* Most recently, it announced that it was holding Mohammad Mansur Jabarah on a material witness warrant, after arrested in connection with a terrorist plot in Singapore, and that he was providing valuable information regarding Al Qaeda's operations. *See generally*, William Rashbaum, Captured Qaeda Member Gives Details on Group's Operations, N.Y. Times, July 27, 2002, at A8.

Memorandum at 1–4. Moreover, at least 26 individuals held on material witness warrants have been publicly identified, and the identities of others held on immigration charges have been disclosed, some reportedly by the Government. *Id; see also* Pls.' Reply at 16, n.24. The Government does not explain why its concerns about cooperation apply with respect to some detainees, but not to other detainees whose identities have been disclosed. *Cf. Lederman v. United States*, 291 F.3d 36, 43 (D.C.Cir. May 31, 2002)(rejecting government's professed security concerns about persons engaged in First Amendment activity on Capitol Hill in light of its demonstrated lack of security concerns about tourists and pedestrians in same area).

Third, the Government has not met its burden of establishing a "rational link" between the harms alleged and disclosure. *Crooker v. Bureau of Alcohol, Tobacco and Firearms*, 789 F.2d 64, 67 (D.C.Cir.1986). Obviously, the release of names would not deter cooperation or prevent detainees from providing valuable information to the Government unless those detained actually had some pre-existing link to or knowledge of terrorist activity.

The Government affidavits assume, but utterly fail to demonstrate, the existence of this link. The affidavits nowhere declare that some or all of the detainees have connections to terrorism. Nor do they provide facts that would permit the Court to infer links to terrorism. For example, the Government has provided no informa-

tion on the standard used to arrest and detain individuals initially.[11] Nor has it provided a general description of evidence that it obtained confirming any initial suspicions of links to terrorism. Indeed, when asked by the Court during the Motions Hearing to explain the standard used to arrest the detainees, or otherwise to substantiate the purported connection to terrorism, the Government was unable to answer. *See* Mot. Hearing Tr. 24:17–18 ("Your Honor, I don't have that information . . .").

The Government's only response is that it cannot "rule out" possible connections to terrorism for every detainee, and that "dire consequences . . . would flow from even one unnecessary disclosure." Def.'s Reply at 8, 15–17. The Government's response is flawed legally and factually.

Legally, it turns FOIA's presumption of disclosure on its head, requiring Plaintiffs to prove the absence of what the Government must show affirmatively in order to withhold the names. 5 U.S.C. § 552(a)(4)(B)("burden is on the agency to sustain" its decision to withhold information). Factually, the record shows that the Government has "ruled out" links to terrorism for hundreds of detainees. Only 74 of the original 751 INS detainees remain in custody. The remainder, some 677, have either been released or deported. Not one of these has been charged with terrorist activity.[12] *See* Def.'s Response to the Court's Order of May 31, 2002; Def.'s Mot., Ex. 6.

---

11. With respect to the INS detainees, Defendant states only that "these individuals were originally questioned because there were indications that they might have connections with, or possess information pertaining to, terrorist activity against the United States." Reynolds Decl. ¶ 10; Watson Decl. ¶ 8.

12. Indeed, the Government's rationale that disclosure would deter the INS detainees from cooperating is also not supported by the case law. Nearly every relevant Exemption 7A case has involved *actual* witnesses or informants in an ongoing or "concrete prospec-

tive law enforcement proceeding." *Bevis*, 801 F.2d at 1389 (in case involving files related to the FBI's investigation of Americans murdered in El Salvador, "concrete prospective law enforcement proceeding" found because numerous convictions had recently been obtained and because many more suspects identified in FBI files); *N.L.R.B. v. Robbins Tire*, 437 U.S. 214, 239, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978)(witness statements in pending unfair labor practice proceedings exempt until completion of NLRB hearing because "employers or . . . unions will coerce or

Therefore, in the absence of an allegation of "reasonable specificity" that detainees have a connection to terrorism, the Government's concern that disclosure would deter cooperation and impair its investigation is pure speculation, and, with respect to the INS detainees, is actually belied by the record. *Campbell v. Department of Justice,* 164 F.3d 20, 30 (D.C.Cir.1998)(speculative or conclusory affidavits do not support summary judgment).

### b. The Government Has Failed to Demonstrate that Disclosure of Names Could Enable Terrorist Groups to Map Its Investigation.

■ The Government's second of three rationales for why disclosure could "interfere with enforcement proceedings" under Exemption 7A is that terrorists might "map the progress of the investigation, and ... develop the means to impede it." Reynolds Decl. ¶ 16. Specifically, the Government advances a so-called "mosaic theory," and argues that no information may be disclosed because "bits and pieces of information that may appear innocuous in isolation, when assimilated with other information . . . will allow the organization to build a picture of the investigation and to thwart the government's attempts to investigate and prevent terrorism." Watson Decl. ¶ 12. Defendant's reliance on the mosaic theory to withhold the detainees' names is misplaced for several reasons.

First, there is simply no existing precedent applying the mosaic theory to Exemption 7. What little precedent does exist applies to Exemption 1 cases, not Exemption 7 cases. *See, e.g., Abbotts v. Nuclear Regulatory Commission,* 766 F.2d 604 (D.C.Cir.1985). Exemption 1 protects matters that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of the national defense or foreign policy." 5 U.S.C. § 552(b)(1). Exemption 1 cases receive considerable deference from the courts, which must give "substantial weight" to agency affidavits on national defense and foreign policy issues. *King v. Department of Justice,* 830 F.2d 210, 217 (D.C.Cir.1987).[13] Significantly, the Government does not rely on Exemption 1 in this case.

Second, application of the mosaic theory would essentially turn 7A into an exemption dragnet, as it would permit the Gov-

---

intimidate employees and others who have given statements, in an effort to make them change their testimony"); *Alyeska Pipeline Service Company v. U.S. Environmental Protection Agency,* 856 F.2d 309, 311 (D.C.Cir.1988)(disclosure of documents pertaining to investigation of corporation that revealed which employees had supplied the documents could "subject them to potential reprisals and deter them from providing further information to EPA").

The Government affidavits offer no evidence that the INS detainees are actual witnesses or informants in any pending or concrete prospective proceeding. Moreover, the Court has uncovered no FOIA case that would permit the Government to do what it wants to do here: withhold information simply because of the possibility, however remote, that the detainees (even those who have been released) have information that might, at a later date, aid the Government's intelligence gathering and law enforcement efforts.

**13.** Defendant relies primarily on *Halperin v. CIA,* 629 F.2d 144 (D.C.Cir.1980), and *Halkin v. Helms,* 598 F.2d 1 (D.C.Cir.1978). Neither is a FOIA case, and both involved security issues not alleged herein. *Halperin* involved interpretation of the National Security Act of 1947, 50 U.S.C. § 403(d)(3), and *Halkin* addressed the "state secrets privilege," which according to our Circuit, "heads the list" of various privileges. *Halkin,* 598 F.2d at 8. In these contexts, as opposed to the Exemption 7 context, courts must accord "utmost deference" to executive assertions of privilege upon grounds of military or diplomatic secrets. *Id.* at 9.

ernment to lump together all information related to an ongoing government investigation and withhold it solely because innocuous parts of data might be pieced together by terrorist groups. This result is contrary to well-settled Exemption 7A case law.

Exemption 7A does not authorize "blanket exemptions" for "all records relating to an ongoing investigation" or "merely because [such information] relates to a pending investigation." *Campbell v. Department of Health and Human Services,* 682 F.2d 256, 259, 262 (D.C.Cir.1982); *see also Crooker,* 789 F.2d at 66–67. Rather, the Government must divide the undisclosed information into "categories that are sufficiently distinct to allow a court to grasp 'how each...category of [information] if disclosed, would interfere with the investigation.'" *Bevis,* 801 F.2d at 1389 (D.C.Cir.1986)(internal citations omitted). Application of the mosaic theory would allow the Government to sidestep this Exemption 7A requirement.

Finally, the key Government affidavit on the mosaic theory was not even prepared for this case, but rather is a copy of the affidavit prepared for an unrelated case filed in the Eastern District of Michigan.[14] *See generally* Watson Decl. That affidavit discusses the potential risks of opening deportation hearings and disclosing *evidence,* not disclosing *identities.*[15] Virtually all of the evidence discussed in the affidavit is information not in issue in this case, such as how or when a given detainee entered the country or what the detainees have told the Government about the operations of terrorist cells. *See* Watson Decl. ¶¶ 12–13.

For these reasons, the Court concludes that the mosaic theory cannot justify the Government's wholesale withholding of names.

**c. The Government Has Failed to Demonstrate that Disclosure of Names Could Enable Terrorist Groups to Create False and Misleading Evidence.**

The third and final rationale the Government offers in support of the 7A withholdings of identities is that disclosure could "interfere with pending proceedings" by "creating false or misleading evidence." The Government's only supporting affidavit on the subject is the Reynolds Declaration,[16] which contains one conclusory sentence, and totally fails to explain how disclosure of names *per se* would lead to the creation of false evidence. *See* Reynolds Decl. ¶ 17. Nor is it apparent to the Court how release of

14. In that case, the district court granted a preliminary injunction ordering the opening of the deportation proceedings of one of the detainees. *See Detroit Free Press v. Ashcroft,* 195 F.Supp.2d 937 (E.D.Mich. Apr.3, 2002). The Court of Appeals for the Sixth Circuit denied the Government's request for a stay of the preliminary injunction. *See Detroit Free Press v. Ashcroft,* No. 02–1437, 2002 WL 1332836 (6th Cir. Apr.18, 2002).

15. Those paragraphs that mention identities refer to a narrow subset of INS detainees. As of June 11, 2002, only 74 detainees remained in custody on INS violations; the rest have been cleared of wrongdoing and released, or deported.

16. Nor is the Watson Declaration of help to the Government, as it too fails to discuss how disclosure of identities could result in evidence tampering. The declaration is limited to explaining how evidence concerning terrorist connections revealed during deportation hearings of certain INS detainees could lead to evidence tampering. *See* Watson Decl. ¶ 16 ("For example, if evidence is disclosed that a particular detainee has funded a terrorist organization through a particular method or scheme, and the United States is now aware of that scheme, other individuals may destroy evidence of funding that organization."). This kind of information is not at issue in this case.

only the names could possibly lead to evidence tampering.

For all the foregoing reasons, the Court finds that none of the Government's three rationales supports its withholding of the detainees' names under Exemption 7A.

## 2. The Government Cannot Rely on Exemptions 7C and 7F to Withhold the Identities of the Detainees.

■ The Government also relies on Exemptions 7C and 7F, arguing that the detainees' privacy interests and personal safety require that the names not be disclosed.

With respect to Exemption 7C, the Government argues that the detainees have a "substantial privacy interest" and that "release of their names ...would forever connect them to the September 11 attacks...caus[ing][ ] embarrassment, humiliation, risk of retaliation, harassment and possibly even physical harm." Reynolds Decl. ¶ 19.

There is no question that there is a substantial privacy interest in not being associated with alleged criminal activity. See, e.g., Stern v. FBI, 737 F.2d 84, 92 (D.C.Cir.1984). However, Exemption 7C does not provide blanket protection to all information that could invade personal privacy. Indeed, if privacy concerns alone were sufficient, the Government could arrest and jail any person accused of a hei-

nous crime and refuse to reveal his or her name to the public.

Instead, Exemption 7C requires a balancing of the "public interest in disclosure" against the "privacy interests implicated" so that only information "constitut[ing] an *unwarranted* invasion" of privacy will be withheld. 5 U.S.C. § 552(b)(7)(C)(emphasis added); *Stern,* 737 F.2d at 92. The public's interest in disclosure lies in "open[ing] agency action to the light of public scrutiny" and revealing what the "Government is up to." *Reporters Committee,* 489 U.S. at 772, 109 S.Ct. 1468; *SafeCard Services, Inc. v. SEC,* 926 F.2d 1197, 1206 (D.C.Cir.1991)(evidence of government misconduct cannot be withheld under 7C).

The federal Government's power to arrest and hold individuals is an extraordinary one. Here, the Government has used its arrest power to detain individuals as part of an investigation that is widespread in its scope and secrecy. Plaintiffs voice grave concerns about the abuse of this power, ranging from denial of the right to counsel and consular notification, to discriminatory and arbitrary detention, to the failure to file charges for prolonged periods of detention, to mistreatment of detainees in custody.[17] *See* Pls.'s Reply at 11–13; Pls.' Mot. at 20–32. The concerns are sufficiently substantial that DOJ's Office of the Inspector General has initiated an investigation into the Government's

---

**17.** The Government dismisses most of this evidence as unsubstantiated hearsay. Plaintiffs have not only offered numerous media reports documenting abuses, but also firsthand accounts given to Congress, the media, and human rights groups, including Amnesty International. *See* Pls.' Mot., Ex. 56 ("Testimony of Gerald H. Goldstein, Esq. before the Committee on the Judiciary of the United States Senate, Dec. 4, 2001") at 1–3; Ex. 32 ("Testimony of Michael Boyle, Esq. before the Committee on the Judiciary of the United States Senate, December 4, 2001") pp. 4–5;

3; *see also* Amnesty International's Concerns Regarding Post September 11 Detentions in the USA (AI Report)(March 14, 2002), available at <http://www.amnesty-usa.org/usacrisis/9.11.detentions2.pdf>. In addition, three of the INS detainees who were deported have now filed lawsuits outlining the abuses. *See* Complaint filed on April 17, 2002 in *Turkmen v. Ashcroft,* 02–CV–02307–JG (E.D.N.Y 2002), available at <http://news.findlaw.com/hdocts/docs/terrorism>; *Cf. United States v. Awadallah,* 202 F.Supp 2d. 55, 61 (S.D.N.Y.2002).

treatment of the detainees. *See* Def.'s Reply at 22, n. 10. Unquestionably, the public's interest in learning the identities of those arrested and detained is essential to verifying whether the Government is operating within the bounds of the law.

However, it must be acknowledged that concern about the privacy and the safety of the detainees—both in this country and abroad—is not without merit. Specifically, with respect to Exemption 7F, the Government states that "revealing the identities could subject them to physical danger both in the United States and in their home countries." Reynolds Decl. ¶ 37.

Therefore, in view of the detainees' interests in privacy and legitimate concerns about their personal safety, and in view of the Court's obligation to balance the privacy interests against the public's interest, the Court concludes that detainees wishing to keep their name confidential may "opt out" of public disclosure by submitting to the Government a signed statement requesting that their identities remain confidential. For all other detainees, Exemptions 7C and 7F do not justify the Government's withholding of names.

### 3. The Government Cannot Rely on Exemption 3 to Withhold the Identities of Material Witnesses.

 Exemption 3 exempts from disclosure information that is protected by any federal statute. The Government argues that Fed.R.Crim.P. 6(e)(2) and (e)(6), which are federal laws that mandate secrecy in grand jury proceedings, bar disclosure under Exemption 3.

As an initial matter, the Court observes that the Government's treatment of material witness information is deeply troubling. A person apprehended as a material witness is *not* accused of any crime but,

instead, has been arrested because it is believed that his or her "testimony is material in a criminal proceeding." 18 U.S.C. § 3144. Furthermore, such person may only be detained until "testimony can adequately be secured by deposition," after which he or she *must* be released. *Id.* Nevertheless, the Government has kept secret virtually everything about these individuals, including the number of people arrested and detained, as well as their identities. The public has no idea whether there are 40, 400, or possibly more people in detention on material witness warrants.

The Government's reliance on grand jury secrecy rules to justify withholding the identities of material witnesses is fundamentally wrong as a matter of law. First, on its face, Fed.R.Crim.P. 6(e) does not bar disclosure of the identities of persons detained as material witnesses. Fed. R.Crim.P. 6(e)(2) prohibits disclosure of "matters occurring before the grand jury." Fed.R.Crim.P. 6(e)(6) provides that "records, orders and subpoenas relating to grand jury proceedings shall be kept under seal to the extent and for such time as is necessary to prevent disclosure of matters occurring before a grand jury."

Second, Plaintiffs have asked for the identities of those held on material witness warrants. They have *not* asked for the identities of grand jury witnesses. Nor is there necessarily an overlap between the two. In fact, the material witness statute itself refers to criminal proceedings generally; it says nothing about grand jury proceedings. *See* 18 U.S.C. § 3144 (referring generically to persons whose "testimony ... is material in a criminal proceeding"). To the extent that there might be overlap, the Government can reveal the names of material witnesses without revealing any information about their status as grand jury witnesses.[18]

18. Moreover, the Government cannot "immunize" identities from disclosure by publicizing the link between grand jury witnesses and material witnesses. *See Washington Post*

Third, the affidavits do not establish that those held as material witnesses are in fact grand jury witnesses. There is no indication in the Government affidavits that the material witnesses have testified before a grand jury, are scheduled to testify before a grand jury, or have been subpoenaed or otherwise ordered to testify.[19] In fact, it is publicly known that at least eight, possibly more, material witnesses who were apprehended as potential grand jury witnesses were released and *never* testified before a grand jury. *See* Pls.' Reply at 17, n. 25.

Finally, the identities of at least 26 individuals who have been held on material witness warrants have already been publicly disclosed. *See* Pls.' Reply at 16–17. The Government's own announcements of the identities of material witnesses undercuts their reliance on Fed. R. Crim P. 6(e). *See In re Petition of Craig*, 131 F.3d 99, 107 (2d Cir.1997) ("[T]he extent to which the grand jury material [is]...public is clearly relevant because even partial previous disclosure often undercuts many of the reasons for secrecy."); *see In re:*

*SEALED CASE NO.* 99–3091, 192 F.3d 995 (D.C.Cir.1999) (name of grand jury witness not covered by Rule 6(e) because identity as a witness was publicly known).

Accordingly, for the foregoing reasons, the Government has not met its burden of showing that disclosure of material witness identities would reveal some "secret aspect of the grand jury's investigation" and may therefore not rely on R. 6(e) and Exemption 3 to justify its across-the-board withholding of the names of all material witnesses.

### 4. The Government Cannot Rely on Sealing Orders to Withhold the Identities of Material Witnesses.[20]

The Government's final argument in support of its decision to withhold identities is that certain federal court orders prohibit it from releasing the identities of some, if not all material witnesses. The Second Supplemental Reynolds Declaration states: "the foregoing material witness warrants are governed by court orders prohibiting the government from releasing any information about these

Co. v. Department of Justice, 863 F.2d 96, 100 (D.C.Cir.1988)("the document itself must reveal the inner workings [of the grand jury]; the government cannot immunize a document by publicizing the link"). Indeed, any "information...[which can] be revealed in such a manner that its revelation would not elucidate the inner workings of the grand jury" is not exempted. *Senate of Puerto Rico v. Dep't of Justice*, 823 F.2d 574, 582 (D.C.Cir.1987). Otherwise, the Government could "shield ...information from public view...by the simple expedient of presenting it to the grand jury." *Id.*

Aside from its own identification of some of these individuals as possible grand jury witnesses at the time of their arrest, *see* Second Supp. Reynolds Decl. ¶ 4 (attached to Def.'s Reply, Ex. 10), the Government has drawn absolutely no connection between disclosure of the names of those detained and a protected aspect of a specific or pending grand jury investigation. *Id.*

19. The Second Supplemental Declaration of James Reynolds is the only declaration to mention this issue: "each of these warrants was issued to procure a witness's testimony before a grand jury." Second Supp. Reynolds Decl. ¶ 4. This statement, however, does not establish that the detained witnesses have actually testified before a grand jury or are even scheduled to testify. It says only that at the time of their arrest shortly after September 11, there was the possibility that they would at some later point be grand jury witnesses.

20. The Government contends there is only one sealed case among the detainees facing criminal charges. *See* Def.'s Response to this Court's Order of May 31, 2002. The Government properly withheld the identity of this detainee.

proceedings. The exact language of these orders varies but the Department of Justice interprets such orders to protect from disclosure not only the contents of the warrants but the very fact of the existence of the warrants." *See* Second Supp. Dec. ¶ 6.

The meaning of this statement is unclear. For example, does it mean that: (1) each federal court that issued a material witness warrant also issued a *separate* sealing order with respect to such witness; (2) courts in criminal cases in which material witnesses have testified have sealed those proceedings; or (3) DOJ is interpreting material witness warrants themselves as sealing orders simply because it believed that those individuals could be grand jury witnesses in the future? *Compare* Reynolds Decl. ¶ 32 ("The United States District Courts before which the material witnesses have appeared have issued sealing orders prohibiting the government from releasing any information about these proceedings."), *with* Def.'s Reply at 33 ("A material witness warrant is issued by a court and therefore qualifies as an 'order' required to remain under seal [pursuant to Fed.R.Crim.P. 6(e) ]").

Without further clarification of the court orders referred to, this Court cannot ascertain whether Defendant has properly withheld the identities of material witnesses on this ground.

Accordingly, insofar as the Government is relying on court orders, it may either submit those orders *in camera* or provide a supplemental affidavit explaining the nature and legal basis for these sealing orders.

### B. The Government Has Properly Withheld the Dates and Locations of Arrest, Detention, and Release.

■ With respect to the dates and locations of arrest, detention, and release, the Court finds that the record is sufficient to support the Government's withholding under Exemptions 7A and 7F.

First, with respect to Exemption 7A, the Government has argued that detailed information of this nature could interfere with the investigation because it would "inform organizations of routes of investigation that were followed but eventually abandoned. . . .could provide insights into the past and current strategies and tactics of law enforcement agencies conducting the investigation." Supp. Reynolds Decl. ¶ 6.

Defendant has emphasized that dates and locations would be particularly valuable to anyone attempting to discern patterns in the Government's investigation and strategy. For example, the Government states that "revealing that in a certain city, on a certain date, a certain number of people were detained, could be extremely useful information to terrorist organizations." Motions Hearing Tr. at 27:14–17; *Id.* at 16:22–25 ("Your Honor, even with those particular [public] indictments, the dates that the individuals were detained, the locations at which they were arrested, things of that nature, we have not provided because that is information that would fit into the mosaic.").

■ Second, the Government has emphasized that disclosure of locations would place the "life or physical safety" of many people at risk because it would make detention facilities vulnerable to retaliatory attacks, and "place at risk not only [ ] detainees, but the facilities themselves and their employees." Reynolds Decl. ¶ 37.

Accordingly, in the absence of any contrary evidence, or any reason to discredit the Government's representations regarding this information, the Court finds that the dates and locations of arrest, detention, and release were properly withheld.

## C. The Government Must Disclose the Identities of the Detainees' Attorneys.

▐ The Government has withheld the identities of counsel for the detainees held on immigration violations and material witness warrants under Exemptions 7A, 7C, and 7F.

With respect to 7A, the Government's affidavits are facially insufficient. The only justification the Government offers is the following conclusory comment: "the rationale that underlies the withholding of the names of the detainees similarly supports the non-disclosure of their lawyers' identities." Reynolds Decl. ¶ 18. Since the Court has rejected the 7A rationales as applied to the detainees' identities, those rationales will obviously not support the Government's withholding of the attorneys' identities.

With respect to Exemptions 7C and 7F, the Government asserts that if the attorneys' identities are revealed, they could be subject to professional humiliation or physical harm (either from angry citizens or from terrorist organizations).[21] *See* Reynolds Decl. ¶¶ 25, 38.

First, it is worth noting that lawyers are a hardy brand of professionals. The legal profession has a long and noble history of fighting for the civil liberties and civil rights of unpopular individuals and political causes, ranging from their advocacy on behalf of WWI dissidents, to their resistance to McCarthy era abuses, to the defense of persons accused of heinous capital crimes.

Second, Defendant's rationale erroneously assumes that lawyers, like suspects or defendants, have an expectation of anonymity; they do not. Nor has the Government offered any contrary evidence or suggested that the lawyers representing the detainees expected that their names would remain confidential. In fact, the names of many lawyers are already publicly known, and there is nothing in the record to suggest that any of the harms prophesied by the Government have occurred.

Third, the Government's recitation of harms is totally speculative, with no factual basis. For example, Defendant states that "some might construe the attorneys as working against the interests of the United States" and therefore "seek to retaliate." Reynolds Decl. ¶ 25. Not only is there no evidence of such retaliation, but the Government assumes, without any support, that citizens do not understand the role of defense lawyers in the American system of justice.

For the foregoing reasons, the Court finds that Exemptions 7A, 7C, and 7F do not protect the identities of the attorneys. Defendant must therefore disclose the identities of the detainees' attorneys.

## D. The Government Did Not Conduct an Adequate Search for Documents.

▐ Finally, Plaintiffs challenge the adequacy of Defendant's search for documents responsive to their request for "all policy directives and guidance issued to

---

21. Specifically, with respect to 7C, Defendant states that: "the overwhelming grief and anger felt by the American people could be directed at these attorneys even more strongly than at the detainees themselves." Reynolds Decl. ¶ 25. In addition, "[the attorneys] run the risk that they will be subjected to harassment or retaliation." *Id.* ¶ 26.

Similarly with respect to 7F, Defendant states: "some might construe the attorneys as working against the interests of the United States and seek to retaliate against them. Also, members of terrorist organizations may fear that detainees are supplying their attorneys with too much information and, lacking the ability to get at the detainees while they are imprisoned, may instead choose to harm their attorneys." Reynolds Decl. ¶ 38.

officials about making public statements or disclosures" about the detainees or about "sealing judicial or immigration proceedings." As noted earlier, the Government released the following two documents in response to Plaintiffs' request: (1) a heavily redacted, two-page document from DOJ entitled "draft talking points" for the Attorney General; and (2) a memorandum via electronic mail from Chief Immigration Judge Michael Creppy to "All Judges; Court Administrators" dated September 21, 2001. Pls.' Reply, Ex. 57.

" 'It is elementary that an agency responding to a FOIA request must conduct[ ] a search reasonably calculated to uncover all relevant documents.' " *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C.Cir.1990)(internal citations omitted). Affidavits attesting to the sufficiency of an agency's search must be detailed and non-conclusory. *Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C.Cir.1990).

Upon review of the affidavits submitted, it is clear that the Government has failed to satisfy its obligation to search in a manner "reasonably calculated to uncover" responsive documents.

First, the affidavits indicate that the FBI did not conduct any search at all, let alone one that was "reasonably calculated" to uncover responsive documents. The FBI's declaration states only that after "consultation [with Mr. Collingwood, an FBI Assistant Director], it was *determined* that the FBI did not have documents responsive to this part of plaintiffs' FOIA request." (emphasis added). *See* Supp. Declaration of Scott A. Hodes, ¶ 3 (attached as Ex. 9 to Def.'s Reply). The declaration says nothing about whether anyone within the FBI conducted a search; nor does it provide an explanation as to why no search was conducted.

Second, the declaration that purports to explain searches conducted within other parts of the Department of Justice also suffers from major deficiencies. Although the agency declaration indicates that three offices within DOJ conducted searches, namely the Office of Information Privacy, the Office of the Attorney General, and the Office of the Deputy Attorney General, no details are provided about how these searches were performed. *See* Pustay Decl. ¶¶ 1,6; *see also Oglesby*, 920 F.2d at 68 ("A reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials.... were searched, is necessary"). Incredibly, the only item recovered within the entire Department of Justice, was a two-page document, entitled "draft talking points" for the use of the Attorney General. A redacted copy was provided to Plaintiffs on January 11, 2002.

Third, the other document disclosed to Plaintiffs clearly indicates the existence of earlier relevant documents, none of which were disclosed. A memorandum from Chief Immigration Judge Michael Creppy sent electronically to "All Judges; Court Administrators" dated September 21, 2001 states that "as [some of the recipients] already know," the Attorney General "has implemented ...procedures [that] require us ... to close the hearing[s] to the public, and to avoid discussing the case or otherwise disclosing any information about the case to anyone outside the Immigration Court." *See* Pls.' Mot., Ex. 57. Defendant had an obligation, after discovery of this document, to search for additional responsive information about those "procedures". *Campbell*, 164 F.3d at 28 (an agency "must revise its assessment of what is 'reasonable' in a particular case to account for leads that emerge during its inquiry.").

Finally, it is simply not credible that no other documents are responsive to Plaintiffs' request. Somehow all United States Attorneys Offices, all FBI offices, all INS offices, and all DOJ offices throughout the

United States were told that matters related to those apprehended in connection with September 11, were to remain secret. How was this directive communicated? The Government never explains how widespread notification was accomplished without the use of a single document produced under FOIA.

For the foregoing reasons, the Court concludes that the Government's search for "all policy directives and guidance issued to officials about making public statements or disclosures" with respect to the detainees or about "sealing judicial or immigration proceedings" was inadequate. The Government must conduct another search.

To summarize the Court's FOIA conclusions, the Court finds that: (1) Exemptions 7 and 3 do not protect the identities of the detainees from disclosure. The Government must therefore release within fifteen days a comprehensive list of names of those individuals it has arrested and detained in connection with its investigation into the events of September 11, 2001 with two exceptions. With respect to the court orders purportedly barring disclosure, the Government must submit within fifteen days the orders for *in camera* review or a supplemental declaration. Any

detainee wishing to keep his or her name confidential may do so by submitting a signed statement to the Government requesting such confidentiality; (2) Exemptions 7A and 7F protect from disclosure the dates and locations of arrest, detention, and release of the detainees; (3) Exemptions 7A, 7C and 7F do not protect the identities of any of the attorneys of the detainees. The Government must release within fifteen days the names of those attorneys; and (4) the Government's search with respect to policy directives and guidance was inadequate. The Government must conduct an additional search for these documents and file a supplemental report with the Court within thirty days.

### E. The First Amendment and Common Law Do Not Entitle Plaintiffs to the Remaining Information.[22]

 Plaintiffs also claim that the First Amendment and common law entitle them to the dates and locations of arrest, detention and release.

It has long been recognized that the public has a First Amendment right of access to criminal proceedings,[23] civil proceedings,[24] and to "receive information and

**22.** It must be noted that the parties devoted little attention to these claims in their briefs.

**23.** *See Richmond Newspapers v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980)(criminal trial); *Globe Newspaper Company v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982)(same); *Press–Enterprise v. Superior Ct.,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) ("Press–Enterprise II") (preliminary criminal proceedings); *Press–Enterprise v. Superior Ct.,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) ("*Press–Enterprise I*") (voir dire proceedings).

**24.** *Publicker Industries v. Cohen,* 733 F.2d 1059, 1070 (3rd Cir.1984)(First Amendment secures to the public and the press a right of

access to civil proceedings because' "a presumption of openness inheres in civil trials as well as criminal trials. We [ ] conclude that the civil trial, like the criminal trial, plays a particular significant role in the functioning of the judicial process and the government as a whole.' ")(internal citations omitted); *Brown & Williamson Tobacco v. FTC,* 710 F.2d 1165, 1178 (6th Cir.1983)("The Supreme Court's analysis of the justifications for access to the criminal courtroom apply as well to the civil trial...The concern of Justice Brennan that secrecy eliminates one of the important checks on the integrity of the system applies no differently in a civil setting."); *cf. Press–Enterprise I,* 464 U.S. at 516, 104 S.Ct. 819 ("the distinction between trials and other official proceedings is not necessarily dispositive,

ideas" pertaining to the conduct of public affairs. *Kleindienst v. Mandel,* 408 U.S. 753, 762, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). This right derives from the core purpose of the First Amendment, which is to ensure "freedom of communication on matters relating to the functioning of government." *Richmond Newspapers, Inc.* 448 U.S. at 575, 100 S.Ct. 2814.

However, the First Amendment is not coterminous with FOIA, and it does not "mandate a right of access" to all "government information." *Richmond Newspapers* 448 U.S. at 583, n. 1, 100 S.Ct. 2814 (Stevens, *J.,* concurring); *Houchins v. KQED,* 438 U.S. 1, 15, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978). To determine whether there is a 1st Amendment right of access, the Supreme Court has relied upon two complementary considerations: first, whether there is "a tradition of accessibility" or, in other words, a historical presumption of access to such information; and second, whether access to the proceedings or records would contribute to the self-governing function and further the democratic process. *Richmond Newspapers,* 448 U.S. at 589, 100 S.Ct. 2814 (Brennan and Marshall, *JJ.,* concurring).

Applying these principles, the Court finds that while it may be true that the fact of an individual's arrest has always been public,[25] there is no argument or record evidence supporting the conclusion that "a tradition of accessibility" attaches to the dates and location of arrest, detention, or release.

Furthermore, Defendant has submitted several affidavits establishing the existence of an important governmental interest. The information sought may be used to map the progress of the Government's law enforcement investigation, and place at risk the detention facilities as well as the physical safety of the detainees and employees. *See* Supp. Reynolds Decl. ¶ 6; Watson Decl. ¶ 12. Finally, Plaintiffs have not offered—and the Court cannot discern—a "less restrictive" means of securing this interest, other than to withhold this information. *Globe Newspaper,* 457 U.S. at 607–8, 102 S.Ct. 2613.

## 2. Common Law

Nor does the federal common law right of access to "inspect and copy public records and documents," *Nixon v. Warner Comm. Inc.,* 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), permit release of this information. Even assuming this information can be considered "public record," the Court finds that the Government's asserted interest in withholding these particular categories of information greatly outweighs the public interest in obtaining it.

The harms the Government forecasts are significant. At the same time, given that the identities of the detainees will be disclosed, the Court sees no added benefit to the public interest in disclosure of the dates and location of arrest and detention. Plaintiffs have not indicated how the public interest would be furthered by the additional disclosures of dates and locations of arrest and detention.

## IV. CONCLUSION

For the foregoing reasons, the **Court grants in part and denies in part** Defendant's Motion for Summary Judgment, and

---

or even important, in evaluating the First Amendment issues.") (Stevens, *J.,* concurring); *Richmond Newspapers,* 448 U.S. at 580, n. 17, 100 S.Ct. 2814 ("historically both civil and criminal trials have been presumptively open").

**25.** *See Reporter's Committee* 489 U.S. at 753, 109 S.Ct. 1468 (police blotters are vastly different from rap sheets because "arrests, indictments, convictions, and sentences are public events that are usually documented in court records.").

grants in part and denies in part, Plaintiffs' Motion for Summary Judgment.

First, with respect to the identities of the detainees, Defendant's Motion is **denied**, and Plaintiffs' Cross–Motion is **granted**. Defendant shall disclose within fifteen days the names of those it has arrested and detained in connection with its September 11, 2001 terrorist investigation. With respect to those detainees for whom the Government contends disclosure is barred by court order, the Government must submit the orders for *in camera* review or provide a supplemental declaration within fifteen days. Furthermore, any detainee wishing to withhold his or her name from public disclosure can submit a signed statement to the Government requesting confidentiality of their identity. The Government shall provide sealed copies of these statements to the Court in support of its disclosures to Plaintiffs.

Second, with respect to the dates of arrest, detention, and release as well as the location of arrest and detention, Defendant's Motion for Summary Judgment is **granted**, and Plaintiffs' Motion for Summary Judgment is **denied**. Defendant has properly withheld this information under Exemptions 7A and 7F. Neither the First Amendment nor the common law right of access entitles Plaintiffs to this information.

Third, with respect to the names of the detainees' lawyers, Defendant's Motion is **denied**, and Plaintiffs' Motion is **granted**. Defendant shall disclose the names of the detainees' attorneys within fifteen days.

Finally, Defendant's search for information in response to Plaintiffs' request for policy directives was inadequate. Defendant must conduct a new search within thirty days.

## ORDER

The matter is before the Court on Defendant's Motion for Summary Judgment ("Def.'s Mot.") and Plaintiffs' Cross-motion for Summary Judgment ("Pls.' Mot."). Upon consideration of the motions, oppositions, replies, the Motions Hearing held in this matter on May 29, 2002, the amicus brief submitted by the Washington Legal Foundation, and the entire record herein, and for the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED**, that Plaintiffs' Motion is **granted** and Defendant's Motion is **denied** with respect to the identities of the detainees. Defendant shall disclose **within fifteen days** the names of those it has arrested and detained in connection with its September 11, 2001 terrorist investigation with the following two exceptions. With respect to the names of detainees for whom the Government contends court orders prohibit disclosure, the Government must submit those orders for *in camera* review or provide a supplemental declaration within fifteen days. Any detainee wishing to withhold his or her name from public disclosure can submit a signed statement to the Government requesting confidentiality of their identity. The Government shall provide within fifteen days sealed copies of these statements to the Court in support of its disclosures to Plaintiffs; it is further

**ORDERED**, that with respect to the dates of arrest, detention, and release as well as the location of arrest and detention, Defendant's Motion is **granted**, and Plaintiffs' Motion is **denied**. Defendant has properly withheld this information under Exemptions 7A, 7C and 7F. Neither the First Amendment nor the common law right of access entitles Plaintiffs to this information; it is further

**ORDERED**, that with respect to the names of the detainees' lawyers, Defendant's Motion is **denied**, and Plaintiffs' Motion is **granted**. Defendant shall dis-

close the names of the detainees' attorneys within fifteen days; it is further

**ORDERED**, that Defendant's search for information in response to Plaintiffs' request for policy directives was inadequate. Defendant must conduct a new search within thirty days.