No. 06-3140-cv
American Civil Liberties Union v. Department of Defense

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term 2006

(Argued: November 20, 2006)     (Decided: September 22, 2008)

Docket No. 06-3140-cv

_____

AMERICAN CIVIL LIBERTIES UNION, CENTER FOR CONSTITUTIONAL RIGHTS, PHYSICIANS FOR HUMAN RIGHTS, VETERANS FOR COMMON SENSE, VETERANS FOR PEACE,

*Plaintiffs-Appellees*,

-against-

DEPARTMENT OF DEFENSE, AND ITS COMPONENTS DEPARTMENT OF ARMY, DEPARTMENT OF NAVY, DEPARTMENT OF AIR FORCE, DEFENSE INTELLIGENCE AGENCY, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF JUSTICE, AND ITS COMPONENTS CIVIL RIGHTS DIVISION, CRIMINAL DIVISION, OFFICE OF INFORMATION AND PRIVACY, OFFICE OF INTELLIGENCE POLICY AND REVIEW, FEDERAL BUREAU OF INVESTIGATION, DEPARTMENT OF STATE, and CENTRAL INTELLIGENCE AGENCY,

*Defendants-Appellants*,

_____

Before:  MCLAUGHLIN, HALL, *Circuit Judges*, and GLEESON, *District Judge*.[1]

The United States Department of Defense and Department of the Army appeal from orders of the United States District Court for the Southern District of New York directing them to release 21 photographs depicting abusive treatment of detainees by United States soldiers in Iraq and Afghanistan.  Appellants claim that the photographs are exempt from disclosure under the Freedom of Information Act.

Affirmed.

_____

[1]     The Honorable John Gleeson of the United States District Court for the Eastern District of New York, sitting by designation.

AMRIT SINGH, American Civil Liberties Union Foundation (Jameel Jaffer, Judy Rabinovitz, Lucas Guttentag, American Civil Liberties Union Foundation; Lawrence S. Lustberg, Megan Lewis, Gibbons, Del Deo, Dolan Griffinger & Vecchione, P.C.; William Goodman, Michael Ratner, Center for Constitutional Rights; Beth Haroules, Arthur Eisenberg, New York Civil Liberties Union Foundation), New York, NY, *for Plaintiffs-Appellees*.

MICHAEL J. GARCIA, United States Attorney for the Southern District of New York (Sean H. Lane, Heather K. McShain, Peter M. Skinner, Jeffrey S. Oestericher, Assistant United States Attorneys, Of Counsel), New York, NY, *for Defendants-Appellants*.

JOHN GLEESON, *United States District Judge*:

The United States Department of Defense and Department of the Army (referred to here as "the defendants") appeal from orders of the United States District Court for the Southern District of New York (Alvin K. Hellerstein, *District Judge*) directing them to release 21 photographs pursuant to the Freedom of Information Act ("FOIA" or "the Act"), 5 U.S.C. § 552 (2006). The photographs depict abusive treatment of detainees by United States soldiers in Iraq and Afghanistan.

On appeal, the defendants contend that the exemption in § 552(b)(7)(F) for law enforcement records that could reasonably be expected to endanger "any individual" applies here because the release of the disputed photographs will endanger United States troops, other Coalition forces, and civilians in Iraq and Afghanistan. They further claim that, notwithstanding the redactions ordered by the district court of 20 of the 21 photographs, disclosure will result in

2

unwarranted invasions of the personal privacy of the detainees they depict, justifying nondisclosure under § 552(b)(6) and (7)(C).

We hold that FOIA exemption 7(F) does not apply to this case. We further hold that the redactions ordered by the district court render the privacy exemptions unavailable to the defendants. Accordingly, we affirm.

BACKGROUND

On October 7, 2003, the plaintiffs filed joint requests with the defendants and various other agencies pursuant to FOIA, 5 U.S.C. § 552 (2006), seeking records related to the treatment and death of prisoners held in United States custody abroad after September 11, 2001, and records related to the practice of "rendering" those prisoners to countries known to use torture. On June 2, 2004, having received no records in response to the requests, the plaintiffs filed the complaint in this case, alleging that the agencies had failed to comply with the law.

On August 16, 2004, to facilitate the search for relevant records, the plaintiffs provided a list of records they claimed were responsive to the FOIA requests. Among the records listed were 87 photographs and other images of detainees at detention facilities in Iraq and Afghanistan, including Abu Ghraib prison. The images from Abu Ghraib (the "Abu Ghraib photos") depicted United States soldiers engaging in abuse of many detainees. The soldiers forced detainees, often unclothed, to pose in dehumanizing, sexually suggestive ways.

The defendants initially invoked only FOIA exemptions 6 and 7(C) as their ground for withholding the Abu Ghraib photos. Those provisions authorize withholding where disclosure would constitute an "unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6), (7)(C). The defendants contended in their motion for summary judgment that these personal privacy

3

exemptions warranted the withholding of the Abu Ghraib photos in order to protect the privacy interests of the detainees depicted in them. The plaintiffs argued in their cross-motion that redactions could eliminate any unwarranted invasions of privacy.

More than two months after oral argument of the cross-motions, the defendants added another justification for withholding the Abu Ghraib photos: exemption 7(F). That exemption authorizes withholding of records "compiled for law enforcement purposes" where disclosure "could reasonably be expected to endanger the life or physical safety of any individual." § 552(b)(7)(F). According to the defendants, release of the Abu Ghraib photos could reasonably be expected to endanger the life or physical safety of United States troops, other Coalition forces, and civilians in Iraq and Afghanistan.

On September 29, 2005 the district court rejected the defendants' arguments and ordered the disclosure of the Abu Ghraib photos. *See ACLU v. Dep't of Def.*, 389 F. Supp. 2d 547, 579 (S.D.N.Y. 2005) (the "Abu Ghraib order"). It determined that redaction of "all identifying characteristics of the persons in the photographs" would prevent an invasion of privacy interests. *Id.* at 571. To the extent that an invasion of privacy might occur in spite of the redactions, the court found that such an invasion would not be "unwarranted" since the public interest involved "far outweighs any speculative invasion of personal privacy." *Id.* at 572-73.

The district court also rejected the defendants' eleventh-hour "supplemental" argument related to exemption 7(F). Without deciding whether the exemption's protection of "any individual" extended as far as the defendants claimed, the court concluded that in any event, "the core values that Exemption 7(F) was designed to protect are not implicated by the release of the [Abu Ghraib] photographs, but . . . the core values of FOIA are very much implicated." *Id.* at

4

578.  The district court stated, "Our nation does not surrender to blackmail, and fear of blackmail is not a legally sufficient argument to prevent us from performing a statutory command." *Id.* at 575.  While acknowledging the "risk that the enemy will seize upon the publicity of the photographs and seek to use such publicity as a pretext for enlistments and violent acts," the court balanced that risk against the benefits of "education and debate that such publicity will foster," and ordered the photos released in redacted form.  *Id*. at 578.

The defendants appealed the Abu Ghraib order, but in March 2006, while the appeal was pending, many of the Abu Ghraib photos were published on the internet by a third party.  The appeal was thereafter withdrawn.

After the appeal was withdrawn, the plaintiffs sought clarification regarding other detainee abuse images, and the defendants confirmed that they were withholding an additional 29 images, again based on exemptions 6, 7(C) and 7(F).  Whereas the Abu Ghraib photos were taken at that one location, the 29 photographs were taken in at least seven different locations in Afghanistan and Iraq, and involved a greater number of detainees and U.S. military personnel.  And while many of the Abu Ghraib photos depicted unclothed detainees forced to pose in degrading and sexually explicit ways, the detainees in the 29 photographs were clothed and generally not forced to pose.  The photographs were part of seven investigative files of the Army's Criminal Investigations Command ("Army CID"), and were provided to Army CID in connection with allegations of mistreatment of detainees.  In three of the investigations, Army CID found probable cause to believe detainee abuse had occurred related to the photographs at issue here.  Soldiers under scrutiny in two of the investigations have been punished under the Uniform Code of Military Justice.

On April 10, 2006, the district court established an expedited procedure for determining whether the 29 images could properly be withheld.[2] By orders dated June 9, 2006 and June 21, 2006, the district court ordered the release of 21 of the disputed photos, all but one in redacted form. The 21 photographs were from six of the seven Army CID investigative files; the district court found that the photographs from one of the files showed no suggestion of abuse and thus need not be produced. Since the defendants' basis for withholding the 29 photographs had been the same as their basis for withholding the Abu Ghraib photos, the district court adopted the reasoning of the Abu Ghraib order.

The defendants' appeal of the June 2006 orders is now before us. There is no cross-appeal, and thus neither the order permitting the withholding of eight photographs nor the order directing redactions of the photographs to be disclosed is before us. We refer here to the 21 photographs in dispute as the "Army photos."

DISCUSSION

A.    *Governing Legal Standards*

The Freedom of Information Act requires that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . , shall make the records promptly available to any person," 5 U.S.C. § 552(a)(3)(A), unless the records fall within one of the Act's nine exemptions, § 552(b)(1)-(9). The Act is broadly conceived to reflect "a general philosophy of full agency disclosure," and its exemptions are exclusive, *FLRA v. U.S. Dep't of Veterans Affairs*, 958 F.2d 503, 508 (2d Cir. 1992), and "must

---

[2] In a letter dated June 29, 2006, the defendants informed the plaintiffs that they were withholding an additional 23 images of detainees based upon FOIA exemptions 6, 7(C), and 7(F), and that they would consider the release of those photographs to be governed by the final ruling in this case.

be narrowly construed," *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 360-61 (1976) (internal quotation omitted)); *see also Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 355-56 (2d Cir. 2005) ("Consistent with FOIA's purposes, these statutory exemptions are narrowly construed." (citing cases)).

FOIA's purpose is to encourage public disclosure of information in the possession of federal agencies so that the people may "know what their government is up to." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 772-73 (1988) (internal quotation and emphasis omitted). "Official information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose." *Id.* at 773. The release of information of this sort vindicates FOIA's basic purpose: "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978); *see also Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004) (describing FOIA as "a structural necessity in a real democracy").

A district court "has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld." § 552(a)(4)(B). As FOIA applies government-wide and no one agency administers it, no agency is entitled to deference in interpreting its provisions. *Al-Fayed v. CIA*, 254 F.3d 300, 307 (D.C. Cir. 2001) (citing cases). Further, FOIA expressly provides for de novo review of agency decisions to withhold records and places the burden of persuasion on the agency. *Reporters Comm.*, 489 U.S. at 755; *see also* § 552(a)(4)(B) ("[T]he court shall determine the matter de novo . . . and the burden is on the agency to sustain its action."). Doubts, therefore, are to be resolved in favor of

7

disclosure. *FLRA*, 958 F.2d at 508; *accord, e.g.*, *Local 3. Int'l Bhd. of Elec. Workers v. NLRB*, 845 F.2d 1177, 1180 (2d Cir. 1988).

As mentioned above, the district court's review of the defendants' invocation of FOIA's exemptions was de novo. Our review of the district court's decisions, which were made on cross-motions for summary judgment, is de novo as well. *See, e.g.*, *Wood v. FBI*, 432 F.3d 78, 82 (2d Cir. 2005) ("This Court reviews *de novo* a district court's grant of summary judgment in a FOIA case.").

B.      *FOIA Exemption 7(F)*

The argument defendants raised as an afterthought below is their lead argument on this appeal. They contend that FOIA exemption 7(F), 5 U.S.C. § 552(b)(7)(F) (2006), justifies withholding the Army photos and that the district court erred in concluding otherwise. Exemption 7(F) allows an agency to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to endanger the life or physical safety of any individual." *Id.* In relying on this exemption, the defendants contend that (a) the Army photos, which were gathered during Army CID investigations, are documents "compiled for law enforcement purposes" within the meaning of the statute; (b) disclosure of the photos could reasonably be expected to incite violence against United States troops, other Coalition forces, and civilians in Iraq and Afghanistan; and (c) since there is no limit to who is protected by exemption 7(F), withholding is warranted.

The first contention is undisputed. The second and third are disputed, but neither was actually decided by the district court. Without deciding whether the defendants had satisfied

8

their burden of showing that the Army photos "could reasonably be expected to" result in acts of violence by insurgents, the district court acknowledged "a risk" of such violence. 389 F. Supp. 2d at 578. It then balanced that risk against the "core values" of FOIA and the benefits of disclosure, concluding that disclosure was warranted. The district court explicitly declined to resolve the parties' dispute regarding the proper construction of the phase "any individual" in exemption 7(F). *Id*.

We resolve the latter dispute here, and our resolution disposes of the exemption 7(F) issue.[3] The defendants argue that the plain meaning of the term "any individual" is unlimited, and thus includes individuals identified solely as military and civilian personnel in Iraq and Afghanistan. Exemption 7(F), the defendants assert, "does not limit its protection to some individuals at the exclusion of others." (Appellants' Br. 29-30.) Rather, the argument continues, "'any' means 'any,'" and there is neither need nor authority to look beyond the plain language of the exemption to determine its breadth.

We disagree. The phrase "any individual" in exemption 7(F) may be flexible, but is not vacuous. Considering, as we must, the words in the statute, the structure of FOIA and its exemption provisions, the chronology of amendments to those provisions, and the requirement that FOIA exemptions be narrowly construed, we cannot read the phrase to include individuals identified solely as members of a group so large that risks which are clearly speculative for any particular individuals become reasonably foreseeable for the group.

1. *The Phrase "Any Individual"*

---

[3] We therefore assume for the purposes of this appeal, but need not decide, that the photographs could reasonably be expected to incite violence against United States troops, other Coalition forces, and civilians in Iraq and Afghanistan.

Exemption 7(F) justifies withholding any law enforcement records that "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). Do the defendants satisfy their burden of establishing the exemption's applicability if they do not point to any one individual and establish that he or she could reasonably be expected to be endangered, but instead point to a group composed of millions of people and establish that it could reasonably be expected that someone in that group will be endangered?

The plain language of the phrase "endanger the life or physical safety of any individual" connotes a degree of specificity above and beyond that conveyed by alternative phrases such as "endanger life or physical safety." It is true that the statute does not read "any *named* individual," and we thus understand it to include individuals identified in some way other than by name -- such as, for example, being identified as family members or coworkers of a named individual, or some similarly small and specific group. This does not, however, mean that the "individual" contemplated by exemption 7(F) need not be identified at all, or may be identified only as a member of a vast population. To the contrary, the legislature's choice to condition the exemption's availability on danger to an *individual,* rather than danger in general, indicates a requirement that the subject of the danger be identified with at least reasonable specificity.

The defendants emphasize that Congress used the word "any" to modify "individual," and contend that the broad scope of the word "any" relieves them of the burden of identifying, even roughly, an individual. We are mindful that the Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). But at least one thing is clear from the Court's decisions interpreting the meaning of the word "any" in federal statutes:

10

"Any" does *not* always deserve the expansive application the defendants urge here.  Rather, a court must construe the term carefully, in light of the statute as a whole as interpreted by accepted principles of construction, and, where applicable, the statutory framework that preceded its enactment.

In *Small v. United States*, for example, the Court examined 18 U.S.C. 922(g)(1), which makes it illegal for a person who has been convicted of a felony "in any court" to possess a firearm.  544 U.S. 385, 387 (2005).  In considering whether a felony conviction in a foreign court brings a gun-toting defendant within the ambit of the law, the Court did not begin (and thereby end) its analysis with a simplistic "'any' means 'any.'"  To the contrary, it began by observing that "[t]he word 'any' considered alone cannot answer this question."  *Id.* at 388.  Although it "demands a broad interpretation, we must look beyond that word itself."  *Id.* (citation omitted).  "In ordinary life, a speaker who says, 'I'll see any film,' may or may not mean to include films shown in another city.  In law, a legislature that uses the statutory phrase 'any person' may or may not mean to include 'persons' outside the jurisdiction of the state."  *Id.* (internal quotation omitted).  Since the other language in the statute did not suggest an intent to reach foreign convictions, there was no legislative history suggesting such an intent, and the presumption against extraterritorial application of statutes instructed courts to decline to find such intent in analogous cases, *id.* at 388-89, the Supreme Court held that "any court" did not mean "*any* court," but rather "any *domestic* court," and foreign convictions could therefore not serve as a predicate to liability under the statute.  *Id.* at 391-93.

The Supreme Court has rejected a broad interpretation of the word "any" in other contexts as well where such interpretation is inconsistent with the statutory context and

11

legislative purpose. The Age Discrimination in Employment Act ("ADEA") forbids an employer's discrimination against "any individual" over 40 years of age "because of such individual's age." 29 U.S.C. § 623 (2006). In *Gen. Dynamics Land Sys., Inc. v. Cline*, the question was whether a health benefit policy favoring only workers at least 50 years of age violated the ADEA rights of the employees who were over 40 but not yet 50. 540 U.S. 581, 584-85 (2004). In other words, did the ADEA's protection of "any individual" over 40 from age discrimination protect the younger group of over-40 workers from discrimination that favored the older group? Espousing the "'any' means 'any'" argument advanced by the defendants here, the Sixth Circuit held that it did. *See Cline v. Gen. Dynamics Land Sys., Inc.*, 296 F.3d 466, 470 (6th Cir. 2002) ("[T]he ADEA requires us to hold . . . that employment age discrimination against *any* worker at least 40 years of age is prohibited . . . ." (emphasis in original)). But the Supreme Court reversed, determining that the Sixth Circuit's construction did not "square with the natural reading of the whole provision preventing discrimination." 540 U.S. at 586. The Court held that only individuals subjected to discrimination that prefers the young to the old have a cause of action under the ADEA. *Id.* at 600; *see also Nixon v. Mo. Mun. League*, 541 U.S. 125, 128-32 (2004) (construing statute's reference to "any entity" providing telecommunications services not to include a state's own subdivisions; "'[A]ny' can and does mean different things depending upon the setting."); *United States v. Palmer*, 16 U.S. (3 Wheat.) 610, 631 (1818) (Marshall, C.J.) (observing that "[t]he words 'any person or persons,' are broad enough to comprehend every human being," but holding that "general words" must be limited "to those objects to which the legislature intended to apply them.").

12

To be sure, sometimes the word "any" in a statute deserves an expansive application. However, consistent with the cases discussed above, the Supreme Court has made it clear that such a result must never be the result of a wooden, uncritical capitulation to the word itself. Rather, it occurs where the surrounding statutory language and other relevant legislative context support it. In *United States v. Gonzales*, 520 U.S. 1, 11 (1997), for example, the Court held that the requirement in 18 U.S.C. § 924(c)(1) that sentences imposed under the statute be consecutive to "any other term of imprisonment" could not properly be limited to *federal* terms of imprisonment. But it did so only after determining that "other language in [the statute] reinforces our conclusion." *Gonzales*, 520 U.S. at 10. Finding "no intimation" in the statute as a whole that Congress meant otherwise, and taking into account the fact that the statute was amended in 1984 to repudiate judicial constructions that narrowed its scope, the Court adopted an expansive interpretation of "any other term of imprisonment." *Id.* at 9-10.

Thus, the defendants' argument that "any individual" in exemption 7(F) must, due solely to the brute force of the word "any," be interpreted to extend its protection to all persons, whether or not they can be identified, no matter how remote they are from the law enforcement investigation in which the disputed records were compiled, and no matter how small the risk to any particular individual, is incorrect. We must examine not only the word "any" but also the language of the remainder of the provision, the structure of FOIA's exemptions, and the context and history leading to its adoption.

We begin with the specific context in which the disputed language is used. It bears emphasis that we construe the Freedom of Information Act. "The title of an act cannot control its words, but may furnish some aid in showing what was in the mind of the legislature." *Palmer*,

16 U.S. (3 Wheat.) at 631. The law was enacted to make agency records available to the public "except as *specifically* stated" in one of the enumerated exemptions. § 552(d) (emphasis added). As mentioned above, though important interests are served by those exemptions, the Supreme Court has repeatedly cautioned that they "are to be narrowly construed." *FBI v. Abramson*, 456 U.S. 615, 630 (1982); *accord U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988); *Rose*, 425 U.S. at 361.

This rule of construction is of central importance here. The defendants' construction of "any individual" as not requiring the government to name or even roughly identify any individual, besides gesturing to the populations of two nations and two international expeditionary forces and showing that it could reasonably be expected that at least one person within them will be endangered, is not a narrow one. The reading of "any individual" as requiring a FOIA defendant to identify an individual with reasonable specificity is a narrower construction, and to be preferred on that ground alone. In *Small*, an analogy to the presumption against extraterritorial application of statutes led the Court to construe "any court" not to include foreign courts. 544 U.S. at 388-89. In *General Dynamics*, the ADEA's statement of purpose and findings counseled against a broad construction of the statute's anti-discrimination provision. 540 U.S. at 590-91. Similarly, here the principle that FOIA exemptions are to be construed narrowly cabins the permissible construction of the phrase "any individual." A construction that requires the agency to identify with reasonable specificity the person or persons who could reasonably be expected to be endangered accords with that principle. The defendants' unbounded interpretation does not.

14

That interpretation is also inconsistent with the remainder of the text of the statute. To construe the word "any" to relieve the government of the burden of identifying an individual who could reasonably be expected to be endangered would be to read "individual" out of the exemption. In effect, it would convert the phrase "endanger the life or physical safety of any individual" into "endanger life or physical safety." Indeed, it is telling that one of the cases the defendants cite misquotes exemption 7(F) in just this way, leading it to conclude that diffuse harms to unknown and unspecified individuals are covered by the exemption. *See Brady-Lunny v. Massey*, 185 F. Supp. 2d 928, 932 (C.D. Ill. 2002) ("Under 5 U.S.C. § 552(b)(7)(F), the Government is exempt from disclosing information about any individual that 'could reasonably be expected to endanger life or physical safety.'"). As we construe statutes to avoid surplusage, *see Xiao Ji Chen v. U.S. Dep't of Justice*, 434 F.3d 144, 152 (2d Cir. 2006) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant[.]" (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001))), we cannot ignore the role that the word "individual" plays in exemption 7(F).

While all harms in the end are suffered by individuals, there is a crucial difference between a showing that disclosure "could reasonably be expected to endanger life or physical safety" and exemption 7(F)'s requirement that disclosure "could reasonably be expected to endanger the life or physical safety of any individual." With large enough populations, remote and speculative risks become radically more likely to manifest in at least one person. No one person can reasonably be expected to die in a car accident, but it is certain that someone somewhere in the world will die in a car accident every day. *See* World Health Org., World Report on Road Traffic Injury Prevention 4 (2004), *available at*

15

http://www.who.org/violence_injury_prevention/publications/road_traffic/world_report/en/index .html (estimating annual global death toll due to motor vehicle accidents as between 750,000 and 1,183,492). Reading the word "individual" out of exemption 7(F) allows consideration of such diffuse and speculative risks. If exemption 7(F) covered information whose disclosure "could reasonably [be] expected to endanger life or physical safety," it might be proper to aggregate individually speculative risks and find that it is reasonably likely that life or physical safety will be endangered somewhere in the world. But exemption 7(F), by conditioning its application on a reasonable expectation of danger *to an individual*, excludes from consideration risks that are speculative with respect to any individual.[4]

This case shows the significance of Congress's decision to require a showing of danger to an individual. With good reason, the defendants do not identify a single person and say that the release of the Army photos could reasonably be expected to endanger that person's life or physical safety; the threat to any one person is far too speculative. What the defendants argue, and what we assume for the purposes of this opinion, is the far different proposition that it could reasonably be expected that out of a population the size of two nations and two international expeditionary forces combined, someone somewhere will be endangered as a result of the release of the Army photos. Thus, we do not consider a case where the defendants have shown exemption 7(F)'s required reasonable expectation of endangerment with respect to one or more

---

[4] We draw support from the fact that Congress elsewhere in the Code distinguishes between assessing a threat to a reasonably identifiable person and assessing a generalized threat to a broader group. The Bail Reform Act asks courts to determine whether a person's release from pretrial detention "will endanger the safety of any other person *or the community*." 18 U.S.C. § 3142(b) (2006) (emphasis added). The reference to the safety of "the community" would be superfluous if such generalized risks could be captured by assessing threats to the safety of "any" person other than the releasee. This authorization to consider risks to the broader "community," considered necessary by Congress in the Bail Reform Act, is conspicuously absent from exemption 7(F).

individuals, but one where the defendants attempt to cobble together that required reasonable expectation of endangerment by aggregating miniscule and speculative individual risks over a vast group of individuals.

We hold that in order to justify withholding documents under exemption 7(F), an agency must identify at least one individual with reasonable specificity and establish that disclosure of the documents could reasonably be expected to endanger that individual. We need not shape the precise contours of the exemption today, as it is not a close question whether the government has identified any relevant individual with reasonable specificity. It is plainly insufficient to claim that releasing documents could reasonably be expected to endanger some unspecified member of a group so vast as to encompass all United States troops, coalition forces, and civilians in Iraq and Afghanistan. The structure of FOIA and the applicable legislative history, both of which contemplate a far narrower role for exemption 7(F) than that envisioned by the defendants, amply confirm our holding.

2. *The Structure of FOIA and its Exemptions*

Our conclusion as to the breadth of exemption 7(F) is supported by the structure of FOIA's exemptions. The context of the exemption severely undercuts the defendants' claim that Congress tucked such a far-reaching and nebulous authority for withholding into one of the several discrete law enforcement exemptions. "Statutory construction . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). Such clarification occurs when "only one of the permissible meanings produces

17

a substantive effect that is compatible with the rest of the law." *Id.* Here the defendants' reading of exemption 7(F) is inconsistent with FOIA's treatment of national security information.

To say that exemption 7(F) does not contemplate withholding records on the basis of diffuse threats of death or physical injury, threats which are individually speculative but which can reasonably be expected with respect to large populations, is not to denigrate such threats, which of course are characteristic of the national security sphere. Indeed, the defendants acknowledge the disclosure issue currently before us as a matter of national security. (*See, e.g.,* Appellants' Br. 25 (seeking substantial deference by the Court to the "predictive judgments on issues of national security" of Brigadier General Carter F. Ham and General Richard B. Myers).) FOIA, however, provides a separate exemption specifically tailored to the national security context, which is a powerful reason not to construe exemption 7(F) as broadly as the defendants urge.

FOIA's exemption 1, 5 U.S.C. § 552(b)(1), exempts from disclosure records that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."[5] Executive Order 13,292 "prescribes a uniform system for classifying, safeguarding, and declassifying national security information." Exec. Order No. 13,292, 68 Fed. Reg. 15,315 (Mar. 25, 2003). It also sets forth limits on what may be classified, by what

---

[5] FOIA's exemption 3, justifying withholding pursuant to other specific statutory authorization, § 552(b)(3), has also been applied to protect certain classes of national security information, *see CIA v. Sims*, 471 U.S. 159, 167-68 (1985) (holding CIA's organic statute qualifies as statutory authorization for withholding records of "intelligence sources and methods" under exemption 3). If anything, this demonstrates that Congress has given due attention to the unique issues relating to national security and further undermines the defendants' suggestion that exemption 7(F) must be read to overlap the statutory scheme protecting national security information.

18

authority, and for how long. First among the limits are prohibitions against classifying information in order to "conceal violations of law, inefficiency, or administrative error" or "prevent embarrassment to a person, organization, or agency." *Id.* § 1.7(a).

Although Executive Order 13,292 is not a law, FOIA incorporates its safeguards into exemption 1. § 552(b)(1)(B). Indeed, earlier versions of these prohibitions were included in Executive Order 11,652 (a precursor to Executive Order 13,292) when Congress initially incorporated such safeguards into exemption 1 in 1974, Pub. L. No. 93-502, 88 Stat. 1561 (1974). *See* Exec. Order No. 11,652, § 4, 37 Fed. Reg. 5209 (Mar. 8, 1972) ("In no case shall information be classified in order to conceal inefficiency or administrative error, [or] to prevent embarrassment to a person or Department . . . .").[6] Not only were similar such safeguards thus contemplated by Congress's 1974 amendment of exemption 1, but the current safeguards were also in force at the time of the 1986 amendments to FOIA. *See* Exec. Order No. 12,356, § 1.6(a), 47 Fed. Reg. 14,874 (1982) ("In no case shall information be classified in order to conceal violations of law, inefficiency, or administrative error; [or] to prevent embarrassment to a person, organization, or agency . . . ."). While the President could theoretically modify the executive branch's classification standards to abrogate these safeguards, substantially the same safeguards have been in force, and incorporated into FOIA through exemption 1, from 1974 to the present. They are therefore properly considered part of the statutory backdrop against which Congress legislated in 1986 when it changed exemption 7(F) to protect information that "could reasonably be expected to endanger the life or physical safety of any individual." Pub. L. No. 99-570, §

---

[6] For more discussion of Congress's 1974 amendments to exemption 1, see Section B.3, *infra*.

1802(a), 100 Stat. 3207 (1986); *see also John Doe Agency*, 493 U.S. at 162 (Scalia, J., dissenting) ("Congress has greatly reduced the possibility of abuse [of exemption 1] by providing that the classification must *be proper under criteria established by Executive order*." (emphasis in original)).

The existence of separate standards for information threatening harm to national security severely undercuts the defendants' asserted construction of exemption 7(F). It would be anomalous if an agency that could not meet the requirements for classification of national security material could, by characterizing the material as having been compiled for law enforcement purposes, evade the strictures and safeguards of classification and find shelter in exemption 7(F) simply by asserting that disclosure could reasonably be expected to endanger someone unidentified somewhere in the world.[7] The defendants' standard is far more favorable to secrecy than even the lowest tier of the current classification system. *See* Exec. Order No. 13,292, § 1.2(a)(3) (defining lowest level of classified information as "Confidential," and authorizing that designation for "information, the unauthorized disclosure of which reasonably could be expected to cause *damage to the national security* that the original classification authority is able to identify and describe." (emphasis added)). The defendants invite us to convert exemption 7(F) into, in effect, an alternative classification mechanism entirely lacking the executive's safeguards and standards. The threats that would justify keeping such information secret are no less diffuse and speculative than those involved in the sphere of

---

[7] The defendants have not explained whether the Army photos may be properly classified, and thereby rendered exempt from disclosure, or why that has not occurred. Their failure to invoke exemption 1 would not foreclose their resort to exemption 7(F) if it applied, but the existence of the separate national security exemption undercuts their argument that exemption 7(F) encompasses information solely because of the national security harm it threatens.

20

national security, but are significantly less grave. Such an alternative classification system is inconsistent with the structure of FOIA's exemptions.

The limitation of exemption 7(F) to law enforcement records does not diminish that inconsistency. First, the ease with which the government can find refuge for its records on the ground that they were compiled for "law enforcement purposes" can hardly be overstated. *See John Doe Agency*, 493 U.S. at 162-64 (Scalia, J., dissenting) (describing the ability to transfer records to an investigation file as "a hole one can drive a truck through"). Second, assuming the utmost good faith of the government, the disparate treatment that would be accorded law enforcement national security information and non-law-enforcement national security information confirms that exemption 7(F) will not bear the weight the defendants place upon it. Information generated from national security operations unconnected to law enforcement would be inexplicably subject to higher judicial scrutiny, through exemption 1, than information generated from national security operations performed by means of law enforcement. It is inconsistent with other provisions of the United States Code to construe law enforcement national security operations to be subject to less judicial oversight -- regarding the secrecy of their records or anything else -- than non-law-enforcement national security operations. *Compare, e.g.*, 18 U.S.C. § 2518(5) (2006) (authorizing law enforcement electronic surveillance only for 30 days before seeking a judicial extension of time, and permitting only one 30-day extension) *with* 50 U.S.C. § 1805(e) (2006) (authorizing various types of national security electronic surveillance for 90-day, 120-day, and 1-year periods and permitting multiple extensions of time).

21

Thus, the structure of FOIA's exemption provision, with its separate exemptions and different standards for national security matters and for law enforcement matters, counsels in favor of the narrower construction of 7(F) that we adopt here.

3.     *The Legislative History of Exemption 7(F)*

An examination of the legislative history and background surrounding the adoption of the current form of exemption 7(F) confirms that the exemption simply does not function as a far broader alternative to the national security classification system.  Congress has always envisioned exemption 7(F) as a shield against specific threats to particular individuals arising out of law enforcement investigations, never as a means of suppressing worldwide political violence.

FOIA was enacted as an antidote to the perceived "loopholes" in Section 3 of the Administrative Procedure Act ("APA"), which allowed agencies "to deny legitimate information to the public."  S. Rep. No. 89-813 (1965), *reprinted in* Subcomm. on Admin. Practice & Procedure, S. Comm. on the Judiciary, 93rd Cong., *Freedom of Information Act Source Book* 36, 38 (Comm. Print 1974) [hereinafter *FOIA Source Book*].  Section 3, the APA's disclosure statute, allowed agencies to withhold information "requiring secrecy in the public interest" or "for good cause."  APA § 3, Pub. L. No. 79-404, 60 Stat. 237, 238 (1946), *reprinted in FOIA Source Book*, *supra*, at 39-40.  Congress feared that this open-ended language may have allowed agencies to withhold information "only to cover up embarrassing mistakes or irregularities."  S. Rep. No. 89-813, *reprinted in FOIA Source Book*, *supra*, at 38; *see also* H.R. Rep. No. 89-1497 (1966), *reprinted in FOIA Source Book*, *supra*, at 22, 33 ("[T]he law which was designed to provide public information about Government activities has become the Government's major shield of secrecy.").

22

In stating the purpose of FOIA, which was passed as an amendment to Section 3 of the APA, the Senate Judiciary Committee stated:

> It is the purpose of the present bill to . . . establish a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language and to provide a court procedure by which citizens and the press may obtain information wrongly withheld. It is important and necessary that the present void be filled. It is essential that agency personnel, and the courts as well, be given definitive guidelines in setting information policies. Standards such as "for good cause" are certainly not sufficient.

S. Rep. No. 89-813, *reprinted in FOIA Source Book*, *supra*, at 38; *see also* H.R. Rep. No. 89-1497, *reprinted in FOIA Source Book*, *supra*, at 33 ("A democratic society requires an informed, intelligent electorate, and the intelligence of the electorate varies as the quantity and quality of its information varies. A danger signal to our democratic society in the United States is the fact that such a political truism needs repeating.").

Congress recognized, however, that certain information should not be disclosed to the public, so it set forth nine exemptions to FOIA.[8] Originally, exemption 7 allowed the

---

[8] When FOIA was first enacted and modified by a minor stylistic amendment, the nine exemptions were articulated as follows:

The provisions of this section shall not be applicable to matters that are

(1) specifically required by Executive order to be kept secret in the interest of national defense or foreign policy;
(2) related solely to the internal personnel rules and practices of an agency;
(3) specifically exempted from disclosure by statute;
(4) trade secrets and commercial or financial information obtained from any person and privileged or confidential;
(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;
(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;
(7) investigatory files compiled for law enforcement purposes except to the extent available by law to a party other than an agency;

withholding of "investigatory files compiled for law enforcement purposes except to the extent available by law to a party other than an agency."  5 U.S.C. § 552(b)(7) (1967).  The exemption precluded private parties engaged in litigation with the government from obtaining more via FOIA than they were entitled to receive under the relevant disclosure rules.  *See* H.R. Rep. No. 89-1497, *reprinted in FOIA Source Book*, *supra*, at 32 (explaining that exemption 7 was necessary because FOIA "is not intended to give a private party indirectly any earlier or greater access to investigatory files than he would have directly in such litigation or proceedings."); *see also Robbins*, 437 U.S. at 224 ("Foremost among the purposes of [exemption 7] was to prevent harm to the Government's case in court." (internal quotation omitted)).

FOIA got off to a slow start.  A series of oversight hearings conducted in 1971 and 1972 by a subcommittee of the House Committee on Government Operations identified several major problem areas in the administration of the statute.  They included bureaucratic delays in response time, fee schedule abuses, over-involvement of political appointees in the decision-making process and a poor attitude among top administration officials toward the "open access" spirit of FOIA.  H.R. Rep. No. 92-1419, at 8 (1972), *reprinted in* Subcomm. on Gov. Info. & Individual Rights, H. Comm. on Gov. Operations, 94th Cong. & Subcomm. on Admin. Practice & Procedure, S. Comm. on the Judiciary, 94th Cong., *Freedom of Information Act and Amendments of 1974 (P.L. 93-502) Source Book* 8, 15 (Comm. Print 1975) [hereinafter *1974 Amendment*

---

(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of any agency responsible for the regulation or supervision of financial institutions; and
(9) geological and geophysical information and data (including maps) concerning wells.

5 U.S.C. § 552(b) (1967).

*Source Book*].  As a result, the committee concluded that "[i]n too many cases, information is withheld, overclassified, or otherwise hidden from the public to avoid administrative mistakes, waste of funds, or political embarrassment."  *Id.*, *reprinted in 1974 Amendment Source Book*, *supra*, at 15.

Additional oversight hearings in 1973 before subcommittees of the Senate Committee on the Judiciary produced similar findings, and the committee concluded that "the primary obstacles to the Act's faithful implementation by the executive branch have been procedural rather than substantive."  *See* S. Rep. No. 93-854 (1974), *reprinted in 1974 Amendment Source Book*, *supra*, at 153.  The resulting amendments, enacted over the veto of President Ford, tightened and clarified some of FOIA's key procedural requirements.  Among the changes were required indices reflecting agency action, standardized search and copy fees for FOIA plaintiffs, time frames for agency action, allowance for recovery of reasonable attorney fees and costs by FOIA plaintiffs, required annual reporting on the administration of FOIA, and an expanded definition of what constitutes an "agency."  *See id.* at 160-87.

The 1974 amendments also altered the exemptions in several significant respects.[9]  First,

_____

[9]    As amended in 1974, Section 552(b) provided as follows:

This section does not apply to matters that are-

(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;
(2) related solely to the internal personnel rules and practices of an agency;
(3) specifically exempted from disclosure by statute;
(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;
(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;
(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

as noted above, they incorporated the executive branch's classification standards by providing that any information withheld pursuant to exemption 1 in the interest of national defense had to be "in fact properly classified pursuant to" executive order. § 552(b)(1)(B). That amendment reversed the effect of the Supreme Court's holding in *EPA v. Mink*, 410 U.S. 73, 84 (1973), that FOIA's grant of judicial review did not empower courts to review executive classification decisions by conducting in camera review of the documents at issue. The amended exemption 1 authorized courts to initiate, where appropriate, such in camera examinations of contested records to determine whether they had been properly classified. 5 U.S.C. § 552(a)(4)(B) (1974); *see also* H.R. Rep. No. 93-1380 (1974) (Conf. Rep.), *reprinted in 1974 Amendment Source Book*, *supra*, at 219, 229 (describing intent to override *Mink* and allow in camera examination).

Second, the 1974 amendments responded to concerns that the opportunity to exempt law enforcement "files" created an incentive among agencies "to commingle various information into

---

(7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel;
(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or
(9) geological and geophysical information and data, including maps, concerning wells.

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.

5 U.S.C. § 552(b) (1974); *see also* Pub. L. No. 93-502, § 2, 88 Stat. 1561, 1563-64 (1974) (amending FOIA exemptions).

one enormous investigatory file and then claim it is too difficult to sift through" to determine whether any of its contents are responsive to a valid FOIA request. 120 Cong. Rec. S19,806-23 (daily ed. Nov. 21, 1974) (Statement of Sen. Hart), *reprinted in 1974 Amendment Source Book*, *supra*, at 451 ("This 'contamination technique' has been widely used by agencies to thwart access to publicly valuable information in their files."). So Congress replaced the word "files" in exemption 7 with the word "records," and ordered agencies to examine individual records containing exempt information and to disclose "any reasonably segregable portion" of those records upon request. § 552(b) (1974); *see Robbins*, 437 U.S. at 229-30 (noting that substituting the word "records" for "files" helped avoid "impermissible 'commingling' by an agency's placing in an investigatory file material that did not legitimately have to be kept confidential").

Finally, the 1974 amendments replaced the broad language of exemption 7, which had covered all investigatory files except to the extent they were already made available by law, with six specific subprovisions. The amended exemption required agencies to demonstrate that each withheld investigatory record fit into one of the six subprovisions. Most significantly for the purposes of this case, the subprovisions authorized the withholding of records that would (1) disclose the identity of a confidential source (or, with respect to criminal law enforcement or national security records, disclose confidential information provided solely by such a source), § 552(b)(7)(D) (1974); or (2) endanger the life or physical safety of "law enforcement personnel," § 552(b)(7)(F) (1974).

The 1974 amendments were intended to reinvigorate FOIA. By eliminating the ability of an agency to place entire law enforcement files out of the public's reach, and then narrowing the withholding authority to the six specified categories of records, they accomplished that goal. But

27

in doing so, the amendments created some problems. Records identifying a confidential source could be withheld, as could records that would endanger law enforcement personnel. But what about records that could endanger the families of such persons, or persons assisting law enforcement who are neither confidential sources nor government employees? Attorney General Edward H. Levi identified these problems in a 1975 memorandum regarding the amendments to the executive branch departments and agencies. The memorandum set forth guidelines for the implementation of the amended FOIA, and stated as follows with respect to exemption 7(F):

> Clause (F), which was added by the Conference Committee, exempts material whose disclosure would "endanger the life or physical safety of law enforcement personnel."
>
> . . .
>
> Clause (F) might apply, for example, to information which would reveal the identity of undercover agents, State or Federal, working on such matters as narcotics, organized crime, terrorism, or espionage. *It is unclear whether the phrase "law enforcement personnel" means that the endangered individual must be technically an "employee" of a law enforcement organization; arguably it does not. It is clear, however, that the language of clause (F) cannot be stretched to protect the safety of the families of law enforcement personnel or the safety of other persons.*

Edward H. Levi, *Attorney General's Memorandum on the 1974 Amendments to the Freedom of Information Act* pt. I-B (1975), *available at* http://www.usdoj.gov/oip/74agmemo.htm.

Those words proved to be prophetic. As the war on drugs and organized crime escalated in the early 1980s, those areas of law enforcement activity "constitute[d] a special problem under FOIA." 132 Cong. Rec. S14,040 (daily ed. Sept. 27, 1986) (statement of Sen. Hatch), and the fact that exemption 7(F)'s protections were limited to "law enforcement personnel" was central to this special problem. As the Deputy Attorney General stated in support of proposed amendments:

28

The current language in Exemption 7(F) exempts records only if their disclosure would endanger the life of a law enforcement officer. However, the exemption does not give similar protection to the life of any other person. S. 774 expands Exemption 7(F) to include such persons as witnesses, potential witnesses, and family members whose personal safety is of central importance to the law enforcement process.

131 Cong. Rec. S253 (daily ed. Jan. 3, 1985) (statement of Carol E. Dinkins, Deputy Attorney General).[10] In response, Congress again amended FOIA in connection with passage of the Anti-Drug Abuse Act of 1986. Senator Hatch, who authored the changes with Senator Leahy, noted during Congressional debate that "no fewer than five different reports studying the impact of FOIA have concluded that the act has harmed the ability of law enforcement officers to enlist informants and carry out confidential investigations." 132 Cong. Rec. S14,038 (daily ed. Sept. 27, 1986) (statement of Sen. Hatch). Instead of being used by members of the public to learn of official conduct, FOIA was being "used by lawbreakers to evade criminal investigation or retaliate against informants." *Id.* (internal quotation omitted). Indeed, a 1982 Drug Enforcement Agency study that found 60% of FOIA and Privacy Act requests "originated within the criminal element." *Id.* Thus, the bill's proponents argued that "the language in 7(F) has an obvious and absurd limitation. Under this language, records are only exempt if they endanger the life of a police officer, without giving similar protection to the life of any natural person." *Id.* at S14,039.

Consistent with this legislative history, the 1986 amendments to exemption 7 reflect the

---

[10] S. 774 was passed by the Senate, but it was not acted on by the House during the 98th Congress. However, § 10 of the bill supplied the language for the 1986 amendments to exemption 7, and the Senate Judiciary Committee's report on § 10 of S. 774 was explicitly adopted by both the Senate and the House sponsors of those amendments. 132 Cong. Rec. S14,296 (daily ed. Sept. 30, 1986) (statement of Sen. Leahy) (adopting S. Rep. No. 221 as "set[ting] out the legislative history which should be consulted to determine the scope of the section we are adopting in this bill"); 132 Cong. Rec. H9465-66 (daily ed. Oct. 8, 1986) (joint statement of Reps. English and Kindness) (similar).

29

lawmakers' desire to limit the ability of drug traffickers and other lawbreakers to use FOIA to enhance their organized criminal activity. Among the enacted changes was the substitution of the words "could reasonably be expected to" for "would" in exemptions 7(A), 7(C), 7(D), and 7(F), which made it easier for the government to demonstrate facts necessary to satisfy those exemptions. *See* 5 U.S.C. § 552(b)(7) (1986).[11] Exemption 7(D) was amended to clarify and expand what agencies should understand the term "confidential source" to include, and what information may be withheld pursuant to that subsection. *See id.*; 132 Cong. Rec. S14,039 (statement of Sen. Hatch) (noting that protections for information submitted "only by" the confidential source in question might result in an absence of necessary protection in the event that multiple informants submit the same information). Exemption 7(E) was expanded to allow agencies to withhold information that would disclose law enforcement guidelines -- in addition to

---

[11] As amended in 1986, exemption 7 allows government withholding of:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information
> (A) could reasonably be expected to interfere with enforcement proceedings,
> (B) would deprive a person of a right to a fair trial or an impartial adjudication,
> (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy,
> (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source,
> (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or
> (F) could reasonably be expected to endanger the life or physical safety of any individual.

5 U.S.C. § 552(b)(7) (1986).

the already protected techniques and procedures -- if disclosure of the guidelines "could reasonably be expected to risk circumvention of the law."  § 552(b)(7)(E).

Finally, exemption 7(F)'s authorization to withhold records to protect "law enforcement personnel" was expanded to allow withholding where release of the records in question "could reasonably be expected to endanger the life or physical safety of any individual."  § 552(b)(7)(F). The amendment fixed the "special problem" FOIA had created for law enforcement by removing the "absurd" limitation on the exemption.

The defendants contend on this appeal that the 1986 amendment to exemption 7(F) altered it fundamentally, transforming it from a shield against specific risks incident to law enforcement investigations into a diffuse and nebulous authority for keeping inflammatory information secret (though, curiously, only inflammatory information in law enforcement files). As an initial matter, we note that the government had a different view at the time.  Deputy Attorney General Dinkins's statement in support of the 1986 amendments described them as modifying the exemption only "slightly," in order to address the specific law enforcement concerns discussed above.  131 Cong. Rec. S248.  The same view is expressed in the legislative history.  *See*, *e.g.*, 132 Cong. Rec. H9462 (daily ed. Oct. 8, 1986) (statement of Rep. English) (the 1986 amendments make "only modest changes to the FOIA" and only "slight[ly]" expand exemption 7(F)).

More importantly, the defendants' argument for an expansive interpretation of the phrase "any individual" misapprehends the special problem the 1986 amendment was enacted to correct. Congress was concerned that criminals might deter or hinder law enforcement investigations by identifying those involved in such investigations and targeting the involved parties or associates

31

or relatives to those parties. Accordingly, it relaxed the category of covered persons, extending its protection to individuals who were not themselves law enforcement personnel but who faced similarly specific threats of violence. What it did not do, and what the legislative history makes clear it never contemplated doing, was to reinvent exemption 7(F) as an all-purpose damper on global controversy. By requiring a showing of danger to an individual, Congress provided a constraint limiting exemption 7(F) to its intended scope -- the protection of individuals subject to a non-speculative risk of harm incident to a law enforcement investigation. The defendants' attempt to sweep far-reaching and speculative national security concerns into exemption 7(F) reaches far beyond the intent of Congress in enacting or amending the provision.

4.    *Subsequent Application of Exemption 7(F)*

Most courts that have upheld the government's reliance on exemption 7(F) have done so where the challenged nondisclosure sought to protect government agents, witnesses, informants, and others who have participated in law enforcement investigations or proceedings. *See Maydak v. U.S. Dep't of Justice*, 362 F. Supp. 2d 316, 321 n.4 (D.D.C. 2005) ("In general, [exemption 7(F)] has been interpreted to apply to names and identifying information of law enforcement officers, witnesses, confidential informants and other third persons who may be unknown to the requester." (citing cases)).[12] The defendants cite a handful of district court decisions in support

---

[12]    *See also, e.g.*, *Rugiero v. U.S. Dep't of Justice*, 257 F.3d 534, 552 (6th Cir. 2001) (information about DEA agents who investigated FOIA plaintiff); *Shores v. FBI*, 185 F. Supp. 2d 77, 85 (D.D.C. 2002) (information identifying three cooperating witnesses and others interviewed during investigation of FOIA plaintiff); *Garcia v. U.S. Dep't of Justice*, 181 F. Supp. 2d 356, 378 (S.D.N.Y. 2002) (information identifying government agents, private citizens and third parties who participated in investigation of FOIA plaintiff); *cf. Ruston v. Dep't of Justice*, No. 06-0224, 2007 WL 809698, at *6 (D.D.C. Mar. 15, 2007) (finding 7(F) inapplicable where government failed to establish "palpable risk" to BOP psychologist's life or physical safety if former inmate's FOIA request were to be granted).

of their expansive construction of the phrase "any individual" in the exemption. (*See* Appellants'
Br. 30-34 (citing *L.A. Times Commc'ns, LLC v. Dep't of the Army*, 442 F. Supp. 2d 880, 900
(C.D. Cal. 2006); *Living Rivers, Inc. v. U.S. Bureau of Reclamation*, 272 F. Supp. 2d 1313, 1321
(D. Utah 2003); *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 215 F. Supp. 2d 94, 108
(D.D.C. 2002), *aff'd in part and rev'd in part*, 331 F.3d 918 (D.C. Cir. 2003); *Brady-Lunny v.
Massey*, 185 F. Supp. 2d 928, 932 (C.D. Ill. 2002)).) These cases are neither controlling nor
persuasive.

The defendants rely most heavily on *Living Rivers*, in which the government sought to
withhold inundation maps of the area below the Hoover and Glen Canyon Dams. 272 F. Supp.
2d at 1314. The Bureau of Reclamation had created the maps to help the government evaluate
the effects of a possible dam failure, and to protect the people living downstream from the
consequences of such a failure. *Id.* at 1315-16. Since the maps revealed information about
specific populated areas, critical infrastructures, and power plant sites that would be affected by
dam failure, the government argued that disclosure of the maps could allow terrorists to endanger
people who live downstream from the dams. *Id.* The court allowed the government to withhold
the maps pursuant to exemption 7(F). *Id.* at 1322.

Like the other opinions cited by the defendants, *Living Rivers* fails to give serious
consideration to the scope of exemption 7(F); to what the government must do to meet its burden
of establishing danger to "any individual"; and to the lack of fit between an expansive reading of
exemption 7(F) and FOIA's treatment of national security information.[13] In holding that persons

_____

[13] The other cases the defendants cite give even less consideration than does *Living Rivers* to the
question of how far exemption 7(F) can be extended. In *L.A. Times* the government sought to withhold the names of
private security contractors ("PSC's") working in Iraq because of the risk that insurgents could use that information

33

living downstream of the dams fell within exemption 7(F), the court stated that the exemption "is neither limited to protect the lives of 'law enforcement personnel,' nor to known, named individuals only." *Id.* at 1321. The defendants here make much of that statement -- with which we agree -- on this appeal. But it does not bear the weight *Living Rivers* or the defendants place on it. Exemption 7(F) is not limited to "known, named individuals." If disclosure of law enforcement records concerning the Cali cartel could reasonably be expected to endanger the lives of an informant's (or a witness's) extended family in Colombia, exemption 7(F) applies. Similarly, the disclosure of the identity of a person providing information about Sicilian drug trafficking might reasonably be expected to endanger that person's relatives and associates in Palermo. In those circumstances, the government need not even know, let alone name, all of those persons before it may properly invoke exemption 7(F) to protect them. Indeed, as discussed above, that was the purpose of enlarging the exemption's protection in 1986 from "law enforcement personnel" to "any individual." But saying that the government does not need to identify an individual by name does not imply that the government does not need to identify an

---

to organize attacks on vulnerable PSC's and their projects. 442 F. Supp. 2d at 898. The court upheld the government's reliance on exemption 7(F), but did so without any discussion of the exemption's scope. *Id.* at 900. Similarly, the brief discussion of exemption 7(F) in *Center for National Security Studies* examined only the causation component of the exemption, not the exemption's scope. *See* 215 F. Supp. 2d at 108 (accepting the government's representations that disclosure of locations of detention facilities in the United States holding people for investigation in the wake of September 11, 2001 would place life or physical safety at risk and noting an "absence of any contrary evidence, or any reason to discredit the government's representations"). Moreover, in affirming that decision, the D.C. Circuit relied solely on exemption 7(A), and made no mention of the district court's reliance on exemption 7(F). *See Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 933-34 (D.C. Cir. 2003). Finally, as noted in Section B.1, *Brady-Lunny v. Massey* misquotes the exemption, *compare* 185 F. Supp. 2d at 932 ("Under 5 U.S.C. § 552(b)(7)(F), the Government is exempt from disclosing information about any individual that 'could reasonably be expected to endanger life or physical safety.'"), *with* 5 U.S.C. § 552(b)(7)(F) (exempting law enforcement records from disclosure only if production of the records "could reasonably be expected to endanger the life or physical safety of any individual"), before, like the foregoing cases, simply assuming the issue currently before us.

34

individual *at all*, or that the government may identify an individual only as being a member of a vast population. *Living Rivers* does not attempt to justify that leap of logic, citing no authority regarding how specifically the individuals contemplated by exemption 7(F) must be identified.[14]

*Living Rivers'* construction of exemption 7(F) may have been influenced by the absence of any allegation of governmental misconduct in that case. We agree with the defendants that once exemption 7(F) is deemed applicable and the requisite risk of harm is demonstrated, the exemption does not call for or even permit a balancing of that risk against the public's interest. But the interest of the public in "greater access to information" must be considered in determining the scope of exemption 7(F) in the first place. *See John Doe Agency*, 493 U.S. at 157 ("[The Court] has endeavored to apply a workable balance between the interests of the public in greater access to information and the needs of the Government to protect certain kinds of information from disclosure."). Unlike in *Living Rivers*, the facts of this case place governmental accountability at the center of the dispute. In a respect that court had no reason to consider, we must be especially mindful that exemptions to FOIA are to be "narrowly construed," *Abramson*, 456 U.S. at 630.

In any event, while *Living Rivers* applied a relaxed standard to the government's identification of an individual who could reasonably be expected to be endangered, even that court did not go as far as the defendants wish to here. The court in *Living Rivers* applied exemption 7(F) to protect a specific, identifiable set of individuals. Though the persons at risk in

---

[14] It does cite *Garcia*, 181 F. Supp. 2d at 378, which supports the proposition that the individuals at risk need not be law enforcement personnel. *Living Rivers*, 272 F. Supp. 2d at 1321. But *Garcia*, which applied exemption 7(F) to justify withholding the names and identifying information for several private citizens who provided information to the FBI, 181 F. Supp. 2d at 378, provides no support for the proposition that the government need not identify the individuals in question, or that it may do so in the most general terms.

the event of dam failures were not individually named, they hardly represented "the public at large," as the defendants have argued. (*See* Appellants' Reply Br. 8.) To the contrary, they resided within the specific areas identified in the maps at issue. They may have been numerous, but unlike the population at issue here there is no suggestion in that case that they could not all have been specifically identified.

It is worth remarking that the defendants' interpretation of 7(F) is currently idiosyncratic. The robust public debate on the choice between law enforcement and other methods in formulating our national security policy has been devoid, to our knowledge, of any mention of law enforcement's broader shroud of secrecy under FOIA than non-law-enforcement national security operations -- mention one would expect to find if the government's view of exemption 7(F) were the law. *Cf.* Michael Sherman, *FOIA in the Aftermath of 9/11*, 19 St. Thomas L. Rev. 281, 293 (2006) ("To date, Exemption 7F has not played a major role in post-9/11 FOIA case law.").

Instead, virtually every court having occasion to interpret exemption 7(F) has been called upon to determine whether the disclosure of law enforcement records could reasonably be expected to endanger the life or physical safety of any individuals who participated in some way in the investigation, be they law enforcement employees, informants, or witnesses, or others associated in some way with those persons. Significantly, the defendants themselves first invoked exemption 7(F) in precisely this way. Their initial resort to the exemption in the district court sought to protect only "the identities of citizens of Iraq or Afghanistan who may have cooperated with [Army] CID or other U.S. forces." (Third Declaration of Phillip J. McGuire, July 20, 2005, ¶ 13.) It was only two months after oral argument of the cross-motions for

summary judgment that they dramatically expanded their application, converting a law enforcement matter into a national security issue.

Although this is one of the first cases to examine whether exemption 7(F) can be conscripted into service as an ersatz classification system, it is unlikely to be the last. The defendants' reassurances that their rule would be "[l]imited to the [f]acts [p]resented by [t]his [c]ase," (Appellants' Reply Br. 17), ring hollow. While it is true, as the defendants contend, that expert affidavits deem these particular documents to pose such a danger, we have no doubt that similar affidavits could be produced with respect to many other documents in a wide range of cases, particularly controversial documents that the government might have the greatest motivation to withhold. (*See* Appellees' Br. 20 ("[The government's argument] leads to the perverse conclusion that the more egregious the misconduct revealed by government records, the more compelling would be the government's basis for shielding these documents from disclosure under FOIA.").) This is not due to any question regarding the good faith or the expertise of the affiants, but rather to the fact that even remote possibilities can become reasonable to expect to befall at least one member of a large enough group. An expert could in good faith claim that it is reasonable to expect that disclosure of any number of documents could endanger the life or physical safety of at least one person in the world.[15] The government's contention that "any individual" encompasses a person identified only as belonging to of a population of national size would, if accepted, circumvent the limitation imposed by the phrase "could reasonably be expected to endanger." It would radically transform exemption 7(F) from a flexible but tailored

---

[15] While the defendants here claim endangerment only to persons drawn from the populations of two nations and not the entire world, the defendants' reading of exemption 7(F) does not provide any limiting principle.

protection for a fluid but limited class of persons into an alternative secrecy mechanism far broader than the government's classification system. As such a result would read "individual" out of the provision and would create anomalous disparities between the treatment of law enforcement and non-law enforcement national security information, we decline to so transfigure exemption 7(F).

C.     *FOIA Exemptions 6 and 7(C)*

FOIA exemptions 6 and 7(C) protect against disclosure that implicates personal privacy interests. The government may withhold records in "personnel and medical files and similar files" only when their release "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6) (2006). However, when law enforcement records are involved, the government may withhold records that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." § 552(b)(7)(C). Since the Army photos are considered law enforcement records for the purposes of exemption 7, and are also part of personnel files of the soldiers depicted in the photographs, they are eligible for withholding if the defendants satisfy the standards of either exemption.

Exemption 7(C) is more protective of privacy than exemption 6 because it does not require an invasion of privacy to be *clearly* unwarranted before withholding is allowed, and it may take effect not only when an invasion of privacy "would" occur, but when it could reasonably be expected to occur. *See Favish*, 541 U.S. at 165-66. Because exemption 7(C) offers broader protection than exemption 6 -- and a lower evidentiary standard for the defendants -- a decision that exemption 7(C) does not allow withholding also forecloses the defendants'

reliance on exemption 6. We turn, then, to an examination of exemption 7(C).[16]

        1.    *The Detainees' Privacy Interest*

In the FOIA context, the Supreme Court has recognized an individual privacy interest in "avoiding disclosure of personal matters." *Reporters Committee*, 489 U.S. at 762 (internal quotation omitted). "[O]nce a more than *de minimis* privacy interest is implicated the competing interests at stake must be balanced in order to decide whether disclosure is permitted under FOIA." *FLRA*, 958 F.2d at 510. Disclosure of personal information "constitutes only a *de minimis* invasion of privacy" when identities are unknown. *U.S. Dep't of State v. Ray*, 502 U.S. 164, 176 (1991).

Applying these principles to the privacy interests of the detainees depicted in the Abu Ghraib photos in reasoning it later applied to the Army photos, the district court determined that publication of the photos in a form in which "all identifying characteristics of the persons in the photographs have been redacted" would not cause a cognizable invasion of personal privacy. *ACLU*, 389 F. Supp. 2d at 571. Where "individual recognition could not be prevented without redaction so extensive as to render the images meaningless," the court ordered those photographs to be withheld. *Id.* at 572. The court dismissed as speculative the risk that persons depicted in the photographs might recognize themselves or be recognized by members of the public in spite of the redactions. *Id.*

The district court also rejected arguments that release of the photographs would conflict

---

[16]    Still, because these two exemptions involve related standards, precedent applying exemption 6 is relevant to our analysis of exemption 7(C). *See Reporters Committee*, 489 U.S. at 768 (applying exemption 6 caselaw to analysis of exemption 7(C)); *see also FLRA*, 958 F.2d at 509 (holding the same degree of privacy interest is required to trigger balancing pursuant to exemptions 6 and 7(C), though once a privacy interest is implicated the two exemptions provide differing levels of protection).

with the Geneva Conventions' requirement that detaining powers protect any prisoner of war against insults and "public curiosity." *Id.* at 574. Instead, the court found that redaction is adequate to protect the detainees' identities and to preserve their honor. *Id.*

The defendants now argue that the redactions approved by the district court are inadequate to protect the privacy interests of the detainees. According to the defendants, when combined with information contained in the investigative reports associated with the detainee images, release of the photographs could make it possible to identify the detainees. The defendants also assert that there is a chance that the pictured detainees could identify themselves in any redacted photos released. The defendants emphasize that (a) "Congress and the courts have recognized that victims of crimes or mistreatment, such as the detainees in this case, should not be forced to relive their suffering and humiliation as a result of Government disclosures," (Appellants' Br. at 48); (b) the Supreme Court has recognized a strong privacy interest in "sensitive personal information," (*id.*); and (c) the Geneva Conventions obligate a detaining power to respect the dignity of detainees and avoid exposing them to "public curiosity," (*id.* at 51-52). For these reasons, the defendants assert that the release of images that could lead to the identification of the detainees by themselves or others presents an invasion of the detainees' privacy.[17]

FOIA provides that "[t]o the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes

---

[17] The defendants have not relied on any privacy interest of the soldiers depicted in the Army photos, and we do not address that issue here. The district court considered the privacy rights of the soldiers during the redaction hearing, and found that where they appeared to pose for photographs, their consent removed any privacy interest that might otherwise have warranted redaction of their identifying features.

an opinion, statement of policy, interpretation, staff manual, instruction, or copies of records [produced in response to other FOIA requests and made publicly available due to the likelihood of future requests]." § 552(a)(2). FOIA further states that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." § 552(b).

Accordingly, courts have found redaction of identifying information adequate to prevent infringement of the significant interests that FOIA's privacy exemptions were designed to protect. *See Ray*, 502 U.S. at 175-78 (finding that redaction was appropriate to safeguard personal privacy of Haitian nationals interviewed by State Department in connection with their involuntary repatriation); *Rose*, 425 U.S. at 354-58, 381 (affirming redaction of personal references and other identifying information in Air Force Academy disciplinary records).[18] A court may also order information released without proposed redactions where the government fails to demonstrate a risk of identification in the absence of the redactions. *See Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 485-86 (2d Cir. 1999) (ordering unredacted release of broader set of information where "it is not at all clear" from the government's submissions "that disclosure would, in fact, lead to the identification of the persons who provided the documents").

In this case, the district court held in camera proceedings to ensure the adequacy of proposed redactions to the Army photos. During those proceedings the court learned of the context of each photograph, including matters related to how the government came to possess the

---

[18]    Outside the FOIA context, we have found that where the public right of access to judicial documents competes with privacy rights, "it is proper for a district court, after weighing competing interests, to edit and redact a judicial document in order to allow access to appropriate portions of the document." *United States v. Amodeo*, 44 F.3d 141, 147 (2d Cir. 1995).

41

images, the location of events depicted, and the units that military personnel were assigned to. After examining each of the 29 photographs, the court determined which were to be released and the extent of redaction necessary to shield the identities of individuals depicted. At no point while viewing the Army photos did the district court note the possibility that a detainee could be identified in spite of the redactions. Having inspected the photographs and the redactions ourselves, we have no doubt that the district court examined the Army photos with an aim to redact "all identifying characteristics of the persons in the photographs," *ACLU*, 389 F. Supp. 2d at 571, and that it did so adequately.

The defendants have cited no FOIA case in which a court has found a privacy right to be at risk where identifying information has been adequately redacted. Even accepting their argument that it may be "possible" to identify the detainees in spite of the district court's redactions, or that there remains a "chance" that the detainees could identify themselves, (Appellants' Br. 47), such speculation does not establish a privacy interest that surpasses a *de minimis* level for the purposes of a FOIA inquiry. *Cf. Halpern v. FBI*, 181 F.3d 279, 297-98 (2d Cir. 1999) (holding that government must describe withheld material with "'reasonable' level of specificity" for courts to be able to determine whether exemption 7(C) applies); *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994) (calling for "reasonably detailed explanations why any withheld documents fall within an exemption"). Indeed, because the district court has redacted the Army photos to remove all identifying features, there is no cognizable privacy interest at issue in the release of the Army photos.

The defendants' attention to the privacy rights of crime victims and to the concerns associated with personal information does not alter the above analysis. Factors that may give rise

42

to a heightened privacy interest include the presence of sensitive personal information, dignity of crime victims, and the risk of harm to reputation. *See Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995) (recognizing that the magnitude of a privacy interest turns on whether disclosure may result in unwarranted association with criminal activity or reputational harm). However, such a privacy right attaches when information that is sensitive may be linked to certain individuals, not when the individuals involved are unknown.

For example, in *Favish*, the Supreme Court applied exemption 7(C) to allow the withholding of photographs of the death-scene of Vincent Foster, former Deputy Counsel to the President, after reports that his death was the result of suicide. 541 U.S. at 169-71, 175. Implicit in the Court's discussion of the privacy rights of members of Foster's family with respect to images of scenes of his death was that the images depict an individual whose identity was widely known to the public. The privacy right attached to Foster's family members "to secure their own refuge from a sensation-seeking culture for their own peace of mind and tranquility." *Id.* at 166. If Foster's identity were unknown, such a privacy interest would not arise.

In *Ray*, the Supreme Court recognized that disclosure of identities of Haitians who were repatriated after attempts to enter the United States could subject them or their families to "embarrassment in their social and community relationships," 502 U.S. at 176 (internal quotation omitted), but that redaction of names resulted in a diminished privacy interest, *see id.* ("Although disclosure of such personal information constitutes only a *de minimis* invasion of privacy when the identities of the interviewees are unknown, the invasion of privacy becomes significant when

the personal information is linked to particular interviewees.").[19]

Notwithstanding the defendants' assertions that redactions of the Army photos do not eliminate the possibility that the detainees in the photographs might be identified (even if only by themselves), we find the district court's redactions of identifying features sufficient to warrant the conclusion that the photographs do not implicate the detainees' privacy interests pursuant to FOIA exemption 7(C). *Cf. Rose*, 425 U.S. at 381-82 (upholding disclosure of redacted records under exemption 6 while acknowledging that "redaction cannot eliminate all risks of identifiability").

Even though we are not compelled to balance interests where there is no more than a *de minimis* privacy interest at stake, we note that contrary to the defendants' suggestion there is a significant public interest in the disclosure of these photographs. The defendants concede that these photographs yield evidence of governmental wrongdoing, but nonetheless argue that they

---

[19] One non-FOIA case cited by the defendants, *Northwestern Memorial Hospital v. Ashcroft*, 362 F.3d 923 (7th Cir. 2004), supports the notion that a privacy interest may be at risk even where identities are unknown. In *Northwestern*, the government subpoenaed medical records of certain patients who received late-term abortions. *Id.* at 924. The records would be used in aid of the government's constitutional challenge to the Partial-Birth Abortion Act of 2003, 18 U.S.C. § 1531, and would include details related to the patients' medical and sexual history. *Id.* at 929. In rejecting the government's efforts to gain access to such information for the purposes of litigation, the court noted the following:

> Even if there were no possibility that a patient's identity might be learned from a redacted medical record, there would be an invasion of privacy. Imagine if nude pictures of a woman, uploaded to the Internet without her consent though without identifying her by name, were downloaded in a foreign country by people who will never meet her. She would still feel that her privacy had been invaded. The revelation of the intimate details contained in the record of a late-term abortion may inflict a similar wound.

*Northwestern*, 362 F.3d at 929. *Northwestern*, however, based its holding not on this hypothetical privacy analysis but on the patients' fear of recognition and retaliation in light of the highly charged political controversy regarding abortion; the possibility that many pregnant women would not understand the redactions to protect their privacy; and the high likelihood of actual recognition despite the redactions. *Id.* at 928-29. *Northwestern* is thus inapplicable here.

add little additional value to the written summaries of the depicted events, which have already been made public. This contention disregards FOIA's central purpose of furthering governmental accountability, and the special importance the law accords to information revealing official misconduct. *Robbins*, 437 U.S. at 242 ("The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." (internal citation omitted)). The defendants cite several cases in which public information rendered the incremental value of additional disclosure too slight to outweigh privacy interests,[20] but the court in each of those cases expressly found that there was no reason to believe the information would document government misconduct.[21] Governmental misconduct is conceded here, (Appellants' Br. 15 (noting that several personnel were disciplined in connection with the Army CID investigations)), and we accordingly note that the public interest in disclosure of these photographs is strong. In any event, there is no more than a *de minimis* privacy interest in withholding the redacted photographs.

2. *The Geneva Conventions*

---

[20] *See, e.g.*, *Miller v. Bell*, 661 F.2d 623, 630-31 (7th Cir. 1981) (per curiam) (holding identifying information about FBI agents to be covered by exemption 7(C) and noting that public documents already provided substantial information about FBI's investigation), *abrogated in part on other grounds by U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 181 (1993); *N.Y. Times Co. v. NASA*, 782 F. Supp. 628, 632-33 (D.D.C. 1991) (withholding audio recording of final words of astronauts in space shuttle disaster under exemption 6 in part because transcript was already public); *In re KSTP Television*, 504 F. Supp. 360, 362-64 (D. Minn. 1980) (concluding common law right of access to public records did not justify disclosure of videotapes of blindfolded and bound kidnap victim when information had been made public at trial).

[21] *See Miller*, 661 F.2d at 630 ("There is no allegation of wrongdoing by high-ranking government officials or indeed by any FBI personnel to support any public interest in any further probe into the thoroughness of the instant investigation."); *N.Y. Times*, 782 F. Supp. at 633 (finding information on tapes "sheds absolutely no light on the conduct of any Governmental agency or official"); *KSTP Television*, 504 F. Supp. at 363 ("In [the Abscam] case there was a definite public interest in release of the tapes because the tapes involved the alleged wrongdoing of elected public officials. There is, however, no public interest to be served by release of the tapes here . . . .").

45

The defendants argue that the Geneva Conventions, which protect prisoners of war and detained civilians "against insults and public curiosity," serve as further basis for a finding that FOIA's privacy provisions apply to prevent release of the Army photos. The Third Geneva Convention, covering lawful belligerents, provides that "prisoners of war must at all times be protected, particularly against acts of violence or intimidation and against insults and public curiosity." Geneva Convention Relative to the Treatment of Prisoners of War art. 13, Aug. 12, 1949, 6 U.S.T. 3316 [hereinafter Third Geneva Convention]. The Fourth Geneva Convention, covering civilians, states:

> Protected persons are entitled, in all circumstances, to respect for their persons, their honour, their family rights, their religious convictions and practices, and their manners and customs. They shall at all times be humanely treated, and shall be protected especially against all acts of violence or threats thereof and against insults and public curiosity.

Geneva Convention Relative to the Protection of Civilian Persons in Time of War art. 27, Aug. 12, 1949, 6 U.S.T. 3516 [hereinafter Fourth Geneva Convention]. Both of these treaties were designed to prevent the abuse of prisoners. Neither treaty is intended to curb those who seek information about prisoner abuse in an effort to help deter it.

However, government officials have concluded that release of photographs like the ones in this case would clash with the Geneva Conventions by subjecting the detainees depicted in the photos to public curiosity. (*See* Declaration of Geoffrey S. Corn, March 25, 2005, ¶ 5 ("[R]elease of [the Abu Ghraib] photographs, even with obscured faces and genitals, would be inconsistent with the obligation of the United States to treat the individuals depicted humanely and would pose a great risk of subjecting these individuals to public insult and curiosity.");

46

Declaration of Richard B. Jackson, April 25, 2006, ¶ 9 (release of the Army photos will subject detainees to public curiosity because "[e]ven if the identities of the subjects of the photographs are never established . . . each individual beneficiary of these treaty protections will undoubtedly suffer the personal humiliation and indignity accordant with the knowledge that these photographs have been placed in the public domain").)

The defendants do not claim that the Geneva Conventions constitute specific statutory authorization to withhold these photographs under FOIA's exemption 3, § 552(b)(3), but rather that FOIA should be read to be consistent with the Geneva Conventions, *see Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains . . . ."). We note that "[r]espect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty," *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 168-69 (1999), so long as it has been "consistently adhered to by the Executive Department of the Government," *Sullivan v. Kidd*, 254 U.S. 433, 442 (1921). The defendants' current litigation position, however, is not at all consistent with the executive branch's prior interpretations of the Geneva Conventions.

As an initial matter, the government does not currently interpret the Geneva Conventions to prohibit dissemination of photographs or videos of detainees when those detainees are not identifiable. (*See, e.g.*, Jennifer K. Elsea, *Congressional Research Service Report for Congress: Lawfulness of Interrogation Techniques under the Geneva Conventions*, at CRS-19 (2004) ("[T]he Department of Defense interprets the [Third Geneva Convention] to protect POWs from being filmed or photographed in such a manner that viewers would be able to recognize the

47

prisoner. Photos and videos depicting POWs with their faces covered or their identities otherwise disguised [do] not, in the view of the Department of Defense, violate GPW art. 13."). However, the defendants note that the government's current practice does not allow dissemination of photographs of detainees being abused, even if they are not identifiable. (Appellants' Br. 52-53; Appellants' Reply Br. 23-25.) The defendants argue that a photograph of abuse is so humiliating that its dissemination always opens the detainee to "public curiosity," even if the detainee cannot be identified. But this was not always the government's interpretation of the Geneva Conventions.

Prior to this litigation, the United States has not consistently considered dissemination of photographic documentation of detainee mistreatment to violate the public curiosity provisions of the Geneva Conventions, at least not when the detainee is unidentifiable and the dissemination is not itself intended to humiliate. The 1929 Geneva Conventions, in force during World War II, provided prisoners of war the same protection from "public curiosity" that the Third and Fourth Geneva Conventions offer to prisoners of war and civilians. *Compare* Convention Relative to the Treatment of Prisoners of War art. 2, July 27, 1929, 47 Stat. 2021 ("[Prisoners of war] must at all times be humanely treated, and protected, particularly against acts of violence, insults and public curiosity.") *with* Third Geneva Convention, *supra*, art. 13 ("Prisoners of war must at all times be humanely treated. . . . Likewise, prisoners of war must at all times be protected, particularly against acts of violence or intimidation and against insults and public curiosity."). At the end of the war, the United States government widely disseminated photographs of prisoners in Japanese and German prison and concentration camps. (Declaration of Scott F. Horton, Apr. 27, 2005, ¶ 17.). These photographs of emaciated prisoners, corpses, and remains of prisoners

48

depicted detainees in states of powerlessness and subjugation similar to those endured by the detainees depicted in the photographs at issue here. Yet the United States championed the use and dissemination of such photographs to hold perpetrators accountable.

The government responds that the individuals in the World War II photographs were not in the military custody of the United States, and thus the United States was under no duty to protect them from public curiosity. Therefore, the argument continues, there is no inconsistency between the United States' actions in publicizing photographs documenting German and Japanese detainee abuse and its current position that publicizing photographs documenting its own abuse of detainees would violate the Geneva Conventions. On this clever interpretation, the United States at the end of World War II was properly facilitating "public curiosity," but Nazi Germany and Imperial Japan were obligated by the 1929 Geneva Conventions to defeat those efforts to document their violation of the 1929 Geneva Conventions. We are not persuaded. The far more sensible interpretation of the United States' position is that the United States did not at that time consider documentation of Geneva Convention violations in order to hold the perpetrators accountable to constitute "public curiosity," even when the documentation included photographs of detainees subject to mistreatment.

Further, the defendants' contention that documentation of detainee abuse constitutes public curiosity is impossible to square with the United States' role as the lead prosecuting party of Imperial Japanese General Sadao Araki and others before the International Military Tribunal for the Far East ("IMTFE"). In that case, the IMTFE found the Japanese government's *censorship* of photographs depicting mistreatment of prisoners of war to be evidence of the government's complicity in war crimes, including violations of the 1929 Geneva Conventions.

49

*See United States v. Sadao Araki* (Int'l Mil. Trib. for the Far East Nov. 4-12, 1948), *reprinted in* 60 *International Law Studies* 437, 460-67, 472-76 (Howard S. Levie ed. 1979).  The United States' leading role in that prosecution would have been odd, to say the least, if the United States at the time took the position that the dissemination of photographs showing prisoners of war subject to mistreatment was itself a war crime.

In light of this contrary past practice, we do not defer to the government's current litigation position concerning the meaning of the "public curiosity" provisions of the Third and Fourth Geneva Conventions.  *See, e.g.*, *Perkins v. Elg*, 307 U.S. 325, 339-49 (1939) (declining to defer to executive's interpretation of treaty in light of past practice of contrary interpretation of similar treaties).  We hold that Article 13 of the Third Geneva Convention and Article 27 of the Fourth Geneva Convention do not prohibit dissemination of images of detainees being abused when the images are redacted so as to protect the identities of the detainees, at least in situations where, as here, the purpose of the dissemination is not itself to humiliate the detainees.  (*Cf.* Appellants' Br. 53 (considering possibility of detainees being "subjected to mistreatment through the streets" while hooded).)  This construction is consistent with the past practice of the United States.  It is also the construction publicly adopted by the International Committee for the Red Cross ("ICRC"), which has "had a significant influence on the interpretation of Article 13," (Cummings Decl. 17).  *See Pics "Not Breaching Convention,"* News24.com (May 21, 2004), http://www.news24.com/News24/World/Iraq/0,,2-10-1460_1530825,00.html (noting that ICRC spokesperson stated that photographs of detainee abuse could be released if faces and identifying features are obscured).

More importantly, this construction is consistent with the purpose of furthering humane

50

treatment of captives, which animates Article 13 of the Third Geneva Convention and Article 27 of the Fourth Geneva Convention. *See Senator Linie Gmbh & Co. Kg v. Sunway Line, Inc.*, 291 F.3d 145, 153 n.7 (2d Cir. 2002) ("A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in light of its object and purpose." (quoting Vienna Convention on the Law of Treaties art. 31.1, May 23, 1969, 1155 U.N.T.S. 331)); *see also* Int'l Comm. for the Red Cross, *Commentary: Convention (III) Relative to the Treatment of Prisoners of War* 140 (Jean S. Pictet ed. 1960), *available at* http://www.icrc.org/ihl.nsf/COM/375-590017 ("The requirement that protected persons must at all times be humanely treated is the basic theme of the Geneva Conventions.") [hereinafter *ICRC Commentary*]; *cf. United States v. Noriega*, 808 F. Supp. 791, 795 n.6 (S.D. Fla. 1992) ("While the Red Cross Commentary is not part of the treaty and is not binding law, it is widely recognized as a respected authority on interpretation of the Geneva Conventions."). Release of the photographs is likely to further the purposes of the Geneva Conventions by deterring future abuse of prisoners. To the extent the public may be "curious" about the Army photos, it is not in a way that the text of the Conventions prohibits; curiosity about "enemy prisoners being subjected to mistreatment through the streets," (Appellants' Br. 53), is different in kind from the type of concern the plaintiffs seek to inspire. *See ICRC Commentary*, *supra*, at 141 (characterizing "public curiosity" provision as concerned with protecting "honour" of prisoners). Heightened public awareness of events depicted in the Army photos -- some of which appear to violate the Geneva Conventions -- would serve to vindicate the purposes of the Geneva Conventions without endangering the lives or honor of detainees whose identities are protected.

As the Third and Fourth Geneva Conventions do not prohibit disclosure of photographs

51

of detainee abuse when, as here, the photographs are redacted and the disclosure is not itself intended as an act of humiliation, no need arises to alter the standard analysis under FOIA's exemption 6 and 7(C) in order to construe that statute to be consistent with those conventions. Therefore, the defendants' expressed desire to comply with the Geneva Conventions does not elevate the privacy interests in withholding the redacted Army photos above a *de minimis* level.[22]

## CONCLUSION

As stated above, the defendants have failed to identify an individual who could reasonably be expected to be endangered within the meaning of exemption 7(F). The district court's redactions are sufficient to render inapplicable exemptions 6 and 7(C), even in light of the Third and Fourth Geneva Conventions. Accordingly, we affirm.

---

[22] We note in passing that the defendants did not produce any evidence that any detainees pictured wished the redacted photographs to be withheld in order to protect their privacy.